Paul D. REARDON and John
E. Reardon, Plaintiffs,
Appellants,

v.

UNITED STATES of America and the
United States Environmental Protec-
tion Agency, Defendants, Appellees.

No. 90–1319.

United States Court of Appeals,
First Circuit.

Heard May 8, 1991.

Decided Oct. 29, 1991.

Lynn Wright, with whom Robin F. Price and Edwards and Angell, New York City, were on supplemental brief, for plaintiffs, appellants.

George W. Van Cleve, Deputy Asst. Atty. Gen., with whom Barry Hartman, Asst. Atty. Gen., Washington, D.C., Wayne A. Budd, U.S. Atty., George B. Henderson, II, Asst. U.S. Atty., Boston, Mass., Stephen L. Samuels, Steve C. Gold, Jacques B. Gelin, Attys., Dept. of Justice, Charles Openschowski, Office of Gen. Counsel, E.P.A. and Luis Rodríguez, Asst. Regional Counsel, E.P.A., Washington, D.C., were on supplemental brief, for defendants, appellees.

Before BREYER, Chief Judge, CAMPBELL, TORRUELLA, SELYA and CYR, Circuit Judges.

OPINION EN BANC

TORRUELLA, Circuit Judge.

After removing hazardous substances from property belonging to the Reardons, EPA filed a notice of lien on the property for the amount spent. *See* 42 U.S.C. § 9607(*l*). The Reardons sued to have the notice of lien removed, arguing that they were not liable for the cleanup costs, that the lien was overextensive in that it covered parcels not involved in the clean-up, and that the filing of the lien notice without a hearing deprived them of property without due process. The district court, in *Reardon v. United States*, 731 F.Supp. 558 (D.Mass.1990), decided that it did not have jurisdiction to hear the Reardons' two statutory claims. It ruled that although jurisdiction existed to hear the constitutional claim, the filing of a lien did not amount to a taking of a significant property interest protected by the due process clause. It therefore denied the Reardons' motion for a preliminary injunction, and dismissed their complaint. The Reardons appealed and a panel of this court ruled in their favor on statutory grounds. *Reardon v. United States*, 922 F.2d 28 (1st Cir.1990) (withdrawn). We now consider the appeal en banc. After closely considering applicable law, including most notably the recent case of *Connecticut v. Doehr*, — U.S. —, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), we conclude that the district court correctly decided that it did not have jurisdiction to consider the Reardons' statutory claims, but we find that the CERCLA lien provisions do violate the fifth amendment due process clause.

I.  BACKGROUND

A. *Facts.* In 1979, Paul and John Reardon purchased a 16–acre parcel in Norwood, Massachusetts, adjacent to an electric equipment manufacturing plant site

known as the "Grant Gear" site, and named it "Kerry Place." In 1983, the Massachusetts Department of Environmental Quality Engineering, responding to a report of a nearby resident, tested soil samples from both properties and discovered extremely high levels of polychlorinated biphenyls ("PCBs") on the Grant Gear site and on Kerry Place where it bordered Grant Gear. EPA then investigated the site. Finding the same high levels of PCBs, it authorized an immediate clean-up of the contaminated areas. Between June 25 and August 1, 1983, EPA removed 518 tons of contaminated soil from the two properties. It then notified the Reardons that it had removed all soil with concentrations of PCBs known to be above the safe limit, but informed them that additional areas of contamination might exist, in which case EPA might undertake additional clean-up work.

In 1984, the Reardons subdivided Kerry Place into a number of parcels; they sold five of those parcels and retained ownership of the others. In October 1985, EPA notified the Reardons that, as current owners of Kerry Place, they might be liable under §§ 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 & 9607, along with ten other present and prior owners of the properties, for the clean-up costs.

In August 1987, EPA again investigated the properties to assess the feasibility of a long-term remedy for any remaining contamination. New testing showed that soil in several areas on Kerry Place was still contaminated with PCBs. In April 1988, EPA informed the Reardons of these results. The Reardons told EPA that they intended to clean up their property themselves. EPA advised the Reardons to coordinate any offsite disposal plans with EPA and to obtain EPA's approval of a treatment or disposal facility. In January 1989, the Reardons informed EPA that they had completed their own clean-up of Kerry Place, without having attempted coordination with or sought the approval of EPA.

On March 23, 1989, EPA filed a notice of lien with the Norfolk County Registry of Deeds pursuant to § 107(*l*) of CERCLA, 42 U.S.C. § 9607(*l*), on all of the Kerry Place parcels still owned by the Reardons. The lien was for an unspecified amount, as it secured payment of "all costs and damages covered by" 42 U.S.C. § 9607(*l*) for which the Reardons were liable under § 107(a) of CERCLA, 42 U.S.C. § 9607(a). Five days later, EPA notified the Reardons that it had filed the notice of lien. On July 12, 1989, EPA informed the Reardons that they could settle EPA's claims against them for $336,709, but noted that this amount did not limit the Reardons' potential liability. On September 29, 1989, EPA selected a long-term remedy for the Kerry Place and Grant Gear sites estimated to cost $16,100,000.

B. *Procedural History.* The Reardons filed a complaint and a motion for preliminary injunction in the United States District Court for the District of Massachusetts. They argued that they were entitled to have the notice of lien removed for three reasons. First, the Reardons maintained that they qualified as "innocent landowners" under § 107(b) of CERCLA, 42 U.S.C. § 9607(b), and therefore were not liable for any clean-up costs. Second, 42 U.S.C. § 9607(*l*) provides for a lien on only that property "subject to or affected by a removal or remedial action," 42 U.S.C. § 9607(*l*)(1)(B); the Reardons claim that since some of their Kerry Place parcels were not "subject to or affected by" the clean-up, EPA erred in filing a notice of lien covering all of those parcels. Third, they asserted that EPA's imposition of the lien without a hearing violated the due process clause of the fifth amendment to the United States Constitution.

The district court held that § 113(h) of CERCLA, 42 U.S.C. § 9613(h), divested it of jurisdiction to hear the Reardons' "innocent landowner" and "overbroad lien" claims. It found that the same section also purported to divest it of jurisdiction to hear the due process claim, but held that Congress was without power to place such a limitation on its jurisdiction. Turning to the merits of the due process claim, the

district court held that the lien imposed by § 107(*l*) did not amount to a taking of a "significant property interest" protected by the due process clause. The court therefore denied the motion for a preliminary injunction and dismissed the complaint.

The Reardons appealed, and a panel of this court found in their favor. The panel opinion construed § 9613(h) so as to permit judicial review of the statutory challenges to the lien, and did not reach the due process issue. In response to EPA's petition for rehearing, however, a majority of the court voted to grant a rehearing en banc. Although the court en banc finds for the plaintiffs, as did the panel, we do so on constitutional rather than statutory grounds.

## II. JURISDICTION

■ We turn first to the question of jurisdiction. The district court, as we have noted, held that 42 U.S.C. § 9613(h) purported to divest it of jurisdiction over all three of the Reardons' claims. We agree that § 9613(h) bars review of the "innocent landowner" and "overbroad lien" claims, prior to the commencement of an enforcement or recovery action, but we conclude that this section does not bar review of the due process claim.

Section 9613(h), entitled "Timing of review," explicitly limits the jurisdiction of the federal courts to hear certain cases arising under CERCLA. The section states, in part:

No federal court shall have jurisdiction under Federal law ... to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following: [listing 5 enumerated types of actions]

42 U.S.C. § 9613(h). The five exceptions to the jurisdictional bar are all actions filed by the government or by a private citizen seeking to enforce or recover costs for the enforcement of CERCLA; for this reason, the district court described § 9613(h) as barring "judicial review of EPA actions prior to the time that the EPA or a third party undertakes a legal action to enforce an order or to seek recovery of costs for the cleanup of a hazardous waste site." *Reardon v. United States*, 731 F.Supp. at 564 n. 8. As a convenient shorthand, we will say that § 9613(h) bars "pre-enforcement review" of certain claims.

The district court framed the question of jurisdiction as whether the filing of a lien constituted a "removal or remedial action selected under section 9604 of this title." As the district court noted, the terms "removal" and "remedial action" are defined terms under the CERCLA statute. 42 U.S.C. §§ 9601(23), (24). Another CERCLA provision says that these terms *"include enforcement activities related thereto."* 42 U.S.C. § 9601(25) (emphasis added). The court found that placing a lien on property from which hazardous substances had been removed was a type of enforcement activity. It therefore concluded that any challenge the Reardons could make, whether statutory or constitutional, was a "challenge[ ] to [a] removal or remedial action" over which Congress intended it not to have jurisdiction unless and until EPA brought an enforcement action. *Reardon v. United States*, 731 F.Supp. at 569.

A. *Jurisdiction over the "innocent landowner" and "overbroad lien" claims.* We agree with the district court that filing a lien notice is a type of "enforcement activity" related to a removal or remedial action. And we agree that § 9613(h) bars the federal courts from hearing pre-enforcement challenges to the merits of any particular lien—challenges, for example, to the liability which a lien secures, or to the conformity of that lien to the CERCLA lien provisions. Several considerations lead to these conclusions.

First, we think that the language of the statute, read for its ordinary meaning, supports such an interpretation. Central to the entire CERCLA scheme is a provision that makes certain parties liable for the cost of removal and remedial actions. *See* 42 U.S.C. § 9607(a). When the government files a lien on property to secure payment of that liability, it can reasonably be described as seeking to enforce the liability

provision. Thus, the activity of filing liens is, in ordinary language, an "enforcement activity."

Second, we believe that allowing challenges to the merits of particular liens would defeat some of the purposes of barring pre-enforcement review under § 9613(h). Congress was no doubt concerned, first and foremost, that clean-up of substances that endanger public health would be delayed if EPA were forced to litigate each detail of its removal and remedial plans before implementing them. Thus, the Senate Judiciary Committee Report stated that § 9613(h) barred pre-enforcement review because such review

> would be a significant obstacle to the implementation of response actions and the use of administrative orders. Pre-enforcement review would lead to considerable delay in providing cleanups, would increase response costs, and would discourage settlement and voluntary cleanups.

S.Rep. No. 11, 99th Cong., 1st Sess. 58 (1985).

As long as the remedy upon review of a lien was limited to the invalidation or modification of the lien, of course, such review would not directly delay clean-up of hazardous substances. However, we do not believe that avoiding delay was the only purpose of postponing review. As the Fifth Circuit stated in a similar case:

> Although review in the case at hand would not delay actual cleanup of hazardous wastes, it would force the EPA—against the wishes of Congress—to engage in "piecemeal" litigation and use its resources to protect its rights to recover from any [potentially responsible party] filing such a[n] action.
>
> .    .    .    .    .
>
> Moreover, the crazy-quilt litigation that could result from allowing [potentially responsible parties] to file declaratory judgment actions prior to the initiation of government cost recovery actions could force the EPA to confront inconsistent results.

*Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380, 1390 (5th Cir.1989).

The same practical considerations weigh against allowing pre-enforcement review in this case. And we add to these reasons one more: information needed to decide legal challenges to liens may not be available at the time such challenges are made. To decide, for example, the Reardons' claim that they are innocent landowners, a court must determine whether the contamination pre-dated their ownership; whether they had any knowledge or reason to know of the contamination; whether they had exercised due care with respect to the hazardous substances; and whether they took precautions to prevent releases by foreseeable acts of third parties. *See* 42 U.S.C. § 9607(a), (b)(3), EPA Supplemental Brief, at 16–17 (stressing complexity of resolving innocent landowner claim). Notices of liens are likely to be filed early in the history of a response action—shortly after EPA has begun to spend money on waste removal and the landowner has been notified of potential responsibility. *See* 42 U.S.C. § 9607(*l*) (providing for creation and filing of liens). At that point, EPA is likely not yet to know the full extent of the contamination, let alone when that contamination occurred, or whether it is likely that the owner exercised due care or took reasonable precautions. One purpose of § 9613(h), we believe, is to delay review until enough is known to decide these issues.

Third, legislative history supports the view that § 9613(h) is intended to bar challenges to liability, such as the Reardons seek to make by attacking the lien filing, as well as challenges to the remedy EPA has chosen. During floor debate on this section, Senator Thurmond, Chairman of the Judiciary Committee, which drafted the section, explained:

> Citizens, including potentially responsible parties, cannot seek review of the response action *or their potential liability for a response action*—other than in a suit for contribution—unless the suit falls within one of the categories in this section....

132 Cong.Rec. S14929 (daily ed. Oct. 3, 1986) (emphasis added). Senator Stafford,

Chairman of the Conference Committee, stated: "When the essence of a lawsuit involves the contesting [of] *the liability of the plaintiff for cleanup costs,* the courts are to apply the provisions of section 113(h), delaying such challenges until the Government has filed a suit." 132 Cong. Rec. S14898 (daily ed. Oct. 3, 1986) (emphasis added).

It is certainly possible that Congress inadvertently rather than purposefully included lien challenges in the judicial review bar. Congress amended the scope of "removal" and "remedial" actions to include "enforcement activities related thereto" primarily to ensure that EPA could "recover costs for enforcement actions taken against responsible parties." H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 66–67, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2848–49; *see* H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. 185, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3276, 3278 ("This amendment clarifies and confirms that [enforcement activity] costs are recoverable from responsible parties."). Perhaps Congress did not realize that other provisions referring to removal and remedial actions—such as the judicial review bar—would also be affected. But even if this were so, we do not see how our conclusion is altered. First, as outlined above, reading the statute to bar review of pre-enforcement challenges to liens is consistent with the language and the purpose of the judicial bar. Second, and more importantly, Congress amended a definitional section, thus changing the meaning of "removal" and "remedial" wherever they appear in CERCLA. We cannot give the definition inconsistent readings within the statute. As the above-quoted legislative history makes clear, the 1986 amendment was certainly intended to allow the government to collect attorney's fees in cost recovery actions. *See United States v. Ottati & Goss,* 694 F.Supp. 977, 997 (D.N.H.1988) (allowing attorney's fees to United States under § 9607(a)(4)(A)), *aff'd in part, vacated in part,* 900 F.2d 429 (1st Cir.1990). If liens to ensure the government's complete recovery of its remedial costs are not "enforcement activities" re-lated to the removal or remedial action— the view suggested by the dissent—then we do not see how a suit to recover the government's clean up costs is an "enforcement activit[y]" either. And if "enforcement activities" in § 9601(25) is interpreted to exclude the expenses of cost recovery actions, this would have the effect of denying the government significant amounts of attorney's fees—which was certainly not the intent of Congress. We therefore conclude, as did the district court, that § 9613(h) precludes judicial review of the imposition of a lien until EPA commences an enforcement action.

B. *Jurisdiction over the due process claim.* Unlike the district court, however, we do not believe that § 9613(h) precludes federal court jurisdiction over the Reardons' due process claim. First, such a challenge does not fit into the literal language of § 9613(h). That section refers to "challenges to removal or remedial action selected under section 9604 of this title." Under our reading, it divests federal courts of jurisdiction over challenges to EPA's *administration* of the statute— claims that EPA did not *"select[]"* the proper "removal or remedial action," in light of the standards and constraints established by the CERCLA statutes. The Reardons' due process claim is not a challenge to the way in which EPA is administering the statute; it does not concern the merits of any particular removal or remedial action. Rather, it is a challenge to the CERCLA statute itself—to a statutory scheme under which the government is authorized to file lien notices without any hearing on the validity of the lien.

Second, we read § 9613(h) in light of the Supreme Court's oft-repeated pronouncement that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053–54, 100 L.Ed.2d 632 (1988); *see Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39

L.Ed.2d 389 (1974).[1] We do not believe that the statute expresses a clear congressional intent to preclude the type of constitutional claim the Reardons are making—a challenge to several statutory provisions which form part of CERCLA. However, it is important to make clear that we are not holding that *all* constitutional challenges involving CERCLA fall outside the scope of § 9613(h). A constitutional challenge to EPA administration of the statute may be subject to § 9613(h)'s strictures. Such a claim may well be a "challenge[ ] to removal or remedial action selected under section 9604 of this title," and may thus fall within § 9613(h)'s bar. We find only that a constitutional challenge to the CERCLA *statute* is not covered by § 9613(h).

Third, extending jurisdiction to the Reardons' due process claim does not necessarily run counter to the purposes underlying § 9613(h). For example, resolution of the due process issue does not require any information that is not likely to be available until clean-up of a site is finished. Because it is a purely legal issue, its resolution in a pre-enforcement proceeding does not have the potential to force EPA to confront inconsistent results (as would a finding, for example, that a particular spill was caused by an act of God). Of course, if we decide that filing a notice of a CERCLA lien without any pre-enforcement review *does* violate due process, EPA's collection efforts will no doubt be hampered. However, we do not lightly assume that Congress intended to ease EPA's path even at the expense of violating the Constitution.

Fourth, although the two courts that have considered this issue have reached a different conclusion, *see Barmet Aluminum Corp. v. Reilly*, 927 F.2d 289, 293 (6th Cir.1991); *South Macomb Disposal Authority v. U.S.E.P.A.*, 681 F.Supp. 1244, 1249–51 (E.D.Mich.1988), we are unpersuaded by the reasoning of those cases.

Our disagreement commences with the phrasing of the issue to be decided. Both courts frame the question as whether § 9613(h) "prohibits constitutional as well as statutory challenges until the time pr[e]scribed by the statute." *South Macomb*, 681 F.Supp. at 1249–50; *see Barmet*, 927 F.2d at 292. We think that this question fails to make the distinction we have noted above, *see* pp. 1514–1515, *supra*, between two types of constitutional challenges—challenges to EPA's administration of CERCLA, and challenges to CERCLA itself.

Once we recognize this distinction, the reasoning of these two courts becomes less convincing. First, says the *South Macomb* court,

> Reading the language of § 9613(h) for its everyday meaning supports the notion that this subsection prohibits constitutional as well as statutory challenges until the time pr[e]scribed by the statute. The provision explicitly states that federal courts shall not have jurisdiction to review "any challenge" except for those enumerated.

*South Macomb*, 681 F.Supp. at 1249–50. But, the statute does not bar "any challenge," without qualification; rather, it delays federal court review of "any challenges *to removal or remedial action selected under section 9604 of this title.*" 42 U.S.C. § 9613(h). Because a due process challenge to the CERCLA lien provisions is not, we believe, a challenge to "removal or remedial action selected under section 9604 of this title," we do not find that the "everyday meaning" of § 9613(h) divests the federal courts of jurisdiction to hear such a challenge.

Both the *Barmet* and *South Macomb* courts contend that legislative history—House and Senate Reports, and House Judiciary Committee Hearings—suggests that Congress intended § 9613(h) to bar all pre-enforcement challenges, including all

---

**1.** Of course, § 9613(h) is styled as a provision that merely delays review, rather than precludes it—indeed, it is titled "Timing of review." However, the only available review of the lien notice is in an enforcement action brought by EPA; and the judgment in that enforcement action will render moot the Reardons' due-process-based request for injunctive relief against the filing of the lien, since it will decide whether or not the Reardons are liable under CERCLA. Hence, the effect of § 9613(h) is to preclude review altogether.

constitutional challenges. Upon examination, we find these materials unconvincing as well. The Senate Report states, in part:

> As several courts have noted, the scheme and purposes of CERCLA would be disrupted by affording review of orders or response actions prior to commencement of a government enforcement or cost recovery action. *See, e.g., Lone Pine Steering Committee v. EPA,* [600 F.Supp. 1487 (D.N.J.1985)]. These cases correctly interpret CERCLA with regard to the unavailability of pre-enforcement review. This amendment [§ 9613(h)] is to expressly recognize that pre-enforcement review would be a significant obstacle to the implementation of response actions and the use of administrative orders. Pre-enforcement review would lead to considerable delay in providing cleanups, would increase response costs, and would discourage settlements and voluntary cleanups.

S.Rep. No. 11, 99th Cong., 1st Sess. 58 (1985). We see nothing in this discussion which would indicate an intent to divest federal courts of jurisdiction to consider a claim that the provisions of CERCLA itself authorize deprivations of property without due process of law. On the contrary, the reference to "review of orders or response actions" suggests that the writers of the Senate Report focused their concern on the problems that would arise if courts reviewed the *merits* of particular EPA actions.

Both *Barmet* and *South Macomb* attach great weight to the Senate Report's citation "with approval" of *Lone Pine,* a case decided before § 9613(h) was enacted, which they say held that CERCLA did not allow pre-enforcement review even of constitutional challenges. We think there are good reasons to discount this citation. For one thing, the 13–page opinion in *Lone Pine* contains *no discussion* of the question whether constitutional challenges to the statute as well as challenges to administrative action are barred; one can only infer that the *Lone Pine* court held this view from the facts that (1) the plaintiff's complaint had one constitutional count alongside six statutory counts, and (2) the

court dismissed the entire complaint. In fact, *Lone Pine* cites *Aminoil, Inc. v. EPA,* 599 F.Supp. 69, 72 (C.D.Cal.1984), the leading case holding that CERCLA *did not* bar jurisdiction to review constitutional challenges to the statute; and it does so, not to indicate any disagreement with that holding, but simply to agree with its holding that CERCLA *does* bar pre-enforcement review of administrative orders. *See Lone Pine,* 600 F.Supp. at 1497. For another thing, the Senate Report does not cite *Lone Pine* for the proposition that federal courts have no jurisdiction to hear constitutional challenges; rather, it cites it solely as an example of a group of cases, *sub silentio* holding that review "of orders or response actions" would disrupt the purposes of CERCLA. We do not see why this should indicate agreement with *Lone Pine's* purported holding regarding constitutional challenges, particularly since cases such as *Aminoil* would seem to fit just as easily into the group of cases described in the Report.

We do not find the House Report any more convincing. The pertinent passage in that Report, according to *Barmet* and *South Macomb,* is a statement that "there is no right of judicial review of the Administrator's selection and implementation of response actions until after the response action[s] have been completed...." H.R.Rep. No. 253(I), 99th Cong., 2d Sess. 81, *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2863. *See Barmet,* 927 F.2d at 293 (quoting this passage); *South Macomb,* 681 F.Supp. at 1250 (same). This statement says nothing about judicial review of the CERCLA statute itself.

*South Macomb* also cites testimony of EPA and Justice Department officials during hearings on the bill that contained § 9613(h). In response to a query from Representative Glickman as to whether EPA and the Justice Department "might accept some form of accelerated [pre-enforcement] review," Mr. Habicht, the Assistant Attorney General for Land and Natural Resources, replied:

> Mr. Chairman, briefly, this issue has been litigated under the 1980 statute

quite extensively, and there have been a number of decisions over the last several months that address the fundamental questions of the constitutionality of the procedures set forth in that law. Virtually across the board now the courts are finding that the scheme is constitutional as currently constituted.

Superfund Reauthorization: Judicial and Legal Issues, Hearings before the Subcomm. on Admin. Law and Governmental Relations, H. of Rep. Judiciary Comm., 99th Cong., 1st Sess. at 226 (July 17, 1985); *see South Macomb*, 681 F.Supp. at 1250 (quoting this passage). The *South Macomb* court comments: "Our reading of this exchange is that the EPA and the Department of Justice took the position that because the courts had already upheld the constitutionality of CERCLA, constitutional challenges could also await EPA enforcement actions." *Id.* We do not find this passage quite so clear. It would appear to be an expression of hope by EPA and the Department of Justice rather than a statement of congressional intent, particularly in light of the fact that Congress passed a provision, § 9613(h), that by its language does not bar constitutional challenges to the CERCLA statute.

Finally, the Supreme Court recently examined a statute with a judicial review provision not unlike the CERCLA section analyzed here. At issue in *McNary v. Haitian Refugee Center, Inc.*, ── U.S. ──, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991), was a provision of the Immigration and Nationality Act barring judicial review of a denial of "Special Agriculture Worker" ("SAW") status except in the context of a deportation order. The statute states: "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection." 8 U.S.C. § 1160(e) (as amended by the Immigration Reform and Control Act of 1986). The Court held that this bar did not preclude review of "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *McNary*, 111 S.Ct.

at 896. Rather, it only barred review of individual denials of SAW status. *Id.*

The statute in *McNary* resembles the CERCLA provision at issue here in two respects. First, as here, judicial review of an administrative event is withheld until the agency instigates a second, independent proceeding. More significantly, the immigration statute is phrased so as to bar review of the agency's determination of SAW status in an individual action—an event comparable to EPA's selection of a removal or remedial action, which is the focus of the CERCLA bar. Neither statute mentions the availability of review of a constitutional challenge to the statute itself (as here) or to the agency's execution of the statute (as in *McNary*). Insofar as the Immigration and Nationality Act compares to CERCLA, we think that the holding in *McNary* supports our conclusion here. *See also Johnson v. Robinson*, 415 U.S. 361, 367, 94 S.Ct. 1160, 1165–66, 39 L.Ed.2d 389 (1974) (holding that similar jurisdictional bar precluded review only of administration of statute, not of challenge to statute itself); *cf. Weinberger v. Salfi*, 422 U.S. 749, 762, 95 S.Ct. 2457, 2465, 45 L.Ed.2d 522 (1975) (holding that more expansive language barred all challenges related to statute).

Thus, we conclude that we have jurisdiction to consider the Reardons' due process claim: that the CERCLA statutory scheme under which liens may be imposed on property without opportunity for a hearing violates the fifth amendment due process clause.

## III. THE DUE PROCESS CLAIM

The Supreme Court has established a two-part analysis of due process challenges to statutes which, like this one, involve property rather than liberty interests. One must first ask whether the statute authorizes the taking of a "significant property interest" protected by the fifth amendment. *E.g., Fuentes v. Shevin*, 407 U.S. 67, 86, 92 S.Ct. 1983, 1997, 32 L.Ed.2d 556 (1972). If there is no significant property interest involved, the inquiry is at an end. If there is, one proceeds to examine what process is due in the particular cir-

cumstances. *E.g., id.; Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). We shall address each issue in turn.

A. *The Deprivation.* The district court, relying primarily on *Spielman–Fond, Inc. v. Hanson's, Inc.,* 379 F.Supp. 997 (D.Ariz.1973) (three judge panel), *aff'd mem.,* 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), found that the filing of a federal lien under 42 U.S.C. § 9607(*l*) did not amount to a deprivation of a significant property interest; thus, the court did not reach the second step of the analysis. However, a Supreme Court case decided after the district court had issued its decision (indeed, after oral argument at the en banc rehearing of this appeal) has clarified the law in this area considerably, and has precluded continued reliance on the Court's summary affirmance in *Spielman–Fond.*

In *Connecticut v. Doehr,* —— U.S. ——, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991), a unanimous Court held that a Connecticut attachment statute violated the due process clause. The Court held that the attachment lien on plaintiff Doehr's real property deprived him of a significant property interest within the meaning of the due process clause. The Court stated:

> For a property owner like Doehr, attachment ordinarily clouds title; impairs the ability to sell or otherwise alienate the property; taints any credit rating; reduces the chance of obtaining a home equity loan or additional mortgage; and can even place an existing mortgage in technical default where there is an insecurity clause.

*Doehr,* —— U.S. at ——, 111 S.Ct. at 2113. It concluded that "even the temporary or partial impairments to property rights that attachments, *liens,* and similar encumbrances entail are sufficient to merit due process protection." *Id.* (emphasis added). And, in a footnote, it disposed of its summary affirmance in *Spielman–Fond* by noting that "[a] summary disposition does not enjoy the full precedential value of a case argued on the merits and disposed of by a written opinion." *Id.* at —— n. 4, 111 S.Ct. at 2113 n. 4 (citing *Edelman*

*v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 1359–60, 39 L.Ed.2d 662 (1974)). *See also id.* at ——, 111 S.Ct. at 2113 (Rehnquist, C.J., concurring) (*Spielman–Fond* should not be read to mean that the imposition of a lien is not a deprivation of a significant interest in property).

■ In light of these comments, we cannot but conclude that the lien on real property created in 42 U.S.C. § 9607(*l*) amounts to deprivation of a "significant property interest" within the meaning of the due process clause. The EPA's lien has substantially the same effect on the Reardons as the attachment had on the plaintiff in *Doehr*—clouding title, limiting alienability, affecting current and potential mortgages. We thus turn to the second, more difficult, part of the analysis.

B. *What Process is Due.* The *Doehr* Court reaffirmed the "now familiar threefold inquiry," *id.* at ——, 111 S.Ct. at 2112 required to determine what process is due. That inquiry requires a court to balance

> "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and lastly "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). We apply the *Mathews* test to the facts of this case.

(1) *The Affected Private Interest.* The federal lien here, like the attachment lien in *Doehr,* does not deprive the landowner of possession and use of his property. As *Doehr* said, the effect of such a lien—clouding title, impairing the ability to alienate the property, tainting credit ratings, and reducing the chance of obtaining any further mortgage—"is less than the perhaps temporary total deprivation of household goods or wages." *Id.* However, the interests that the federal lien affects—the same as the interests affected in *Doehr*—

are "significant." *Id.* We note in addition that the CERCLA statute contemplates the filing of a notice of lien well before cleanup procedures are completed, with the result that the lien is not for any sum certain, but for an indefinite amount. This would seem to increase the lien's effect on the landowner's property interests, since a potential buyer or mortgage lender could not identify any limit on the government's interest in the property short of its full value.

(2) *The Risk of Current Procedures and the Value of Additional Safeguards.* This part of the analysis encompasses several considerations. First, we must weigh the nature of the issues which would indicate whether the federal lien in this case has been correctly filed. Are these issues "uncomplicated matters that lend themselves to documentary proof," *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 609, 94 S.Ct. 1895, 1901, 40 L.Ed.2d 406 (1974), thereby minimizing the risk that the lien would be wrongfully filed? Or are the issues "highly factual?" *Doehr,* — U.S. at —, 111 S.Ct. at 2111.

This case falls somewhere between the two extremes. The initial issue of liability under CERCLA is quite straightforward. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), makes owners of "facilities" strictly liable for, among other things, all response costs incurred by the United States "not inconsistent with the national contingency plan." Ownership of land, and the physical presence of hazardous substances on land, are matters that are subject to relatively simple resolution. Whether the response costs were incurred consistently with the national contingency plan is an issue which may be highly factual, but it is usually a matter of the amount, and not the existence, of liability. More likely to be "highly factual" is the determination

whether certain of the owner's parcels of land are "subject to or affected by" EPA's response action. Similarly, on the issue of the landowner's liability, EPA admits in its brief that the "concepts of due care, foreseeability, objective and subjective knowledge, some of which are unique in CERCLA to the innocent landowner defense, are extremely fact-intensive." EPA Supplementary Brief at 16–17.

Second, we must consider what procedural safeguards, if any, CERCLA provides against erroneous filing of a lien.

a. *The right to a judicial hearing.* CERCLA provides no such safeguards. It provides for no pre-deprivation proceedings at all—not even the ex parte "probable cause" hearing judged insufficient in *Doehr. See Doehr* at —, 111 S.Ct. at 2108 (describing Connecticut attachment procedure).

Nor does CERCLA provide for an immediate post-deprivation hearing.[2] The first hearing the property owner is likely to get is at the enforcement proceeding, or cost recovery action, brought by EPA. This action may be brought several years after the notice of lien is filed; it is limited only by a rather complicated statute of limitations, *see* 42 U.S.C. § 9613(g)(2), which gives EPA three years after a removal action is completed or six years after a remedial action is commenced to bring such a suit. The running of the statute of limitations is entirely within EPA's control. Since the government may take its own sweet time before suing, and since the removal or remedial action may itself take years to complete, the lien may be in place for a considerable time without an opportunity for a hearing.

"[M]ere postponement of judicial enquiry is not a denial of due process if the opportunity given for ultimate judicial determination of liability is adequate." *Phillips v.*

---

**2.** The Connecticut statute at issue in *Doehr* provided "expeditious" post-attachment review, *see* — U.S. at —, 111 S.Ct. at 2115, but the Court nonetheless found the statute constitutionally deficient. Even under *Doehr,* though, post-attachment process is not always inadequate. *Doehr* notes the factors leading to the Court's approval, in *Mitchell v. W.T. Grant Co.,*

416 U.S. 600, 94 S.Ct. 1895 (1974), of a sequestration statute with no pre-deprivation review: "the plaintiff had a vendor's lien to protect, the risk of error was minimal because the likelihood of recovery involved uncomplicated matters that lent themselves to documentary proof, and plaintiff was required to put up a bond." *Doehr,* — U.S. at —, 111 S.Ct. at 2114.

*Commissioner,* 283 U.S. 589, 596, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931). But the CERCLA statute of limitations on liens throws the "ultimate judicial determination" so far into the future as to render it inadequate. Indeed, in this respect the CERCLA scheme resembles the replevin statutes in *Fuentes v. Shevin,* where the Court held that the debtor may not be "left in limbo to await a hearing that might or might not 'eventually' occur." *Mitchell v. W.T. Grant Co.,* 416 U.S. at 618, 94 S.Ct. at 1905 (discussing *Fuentes v. Shevin* ).

   b. *Posting of a Bond.* The Court has recognized that requiring the filing party to post a bond may provide the property owner important protection against wrongful filing; in *Doehr,* four members of the Court suggested that due process *always* requires a plaintiff's bond in the context of an attachment. *See Doehr,* —— U.S. at ——, 111 S.Ct. at 2116 (plurality). CERCLA does not require EPA to post a bond when filing the notice of federal lien.

   c. *Action for damages.* In *Doehr,* the State of Connecticut argued that the availability of a double damages remedy for suits that are commenced without probable cause was an important protection against misuse of the attachment provisions; however, four members of the Court did not find the availability of such a suit to be an adequate procedural safeguard. Four members of the court explained in detail why an action for damages would never prove adequate:

> The necessity for at least a prompt postattachment hearing is self-evident because the right to be compensated at the end of the case, if the plaintiff loses, for all provable injuries caused by the attachment is inadequate to redress the harm inflicted, harm that could have been avoided had an early hearing been held. An individual with an immediate need or opportunity to sell a property can neither do so, nor otherwise satisfy that need or recreate the opportunity. The same applies to a parent in need of a home equity loan for a child's education, an entrepreneur seeking to start a business on the strength of an otherwise

strong credit rating, or simply a homeowner who might face the disruption of having a mortgage placed in technical default.

*Doehr,* —— U.S. at ——, 111 S.Ct. at 2118 (plurality).

   In this case, EPA asserts that the Reardons might recover damages for the wrongful filing of a lien by filing a suit under the Tucker Act, 28 U.S.C. § 1491(a)(1) claiming that the lien was a taking without compensation in violation of the fifth amendment. The Reardons counter that a Tucker Act suit would not be possible in this case. It appears to us that recovery under the Tucker Act would be, at best, questionable, and any potential relief or recovery would be inadequate in the same way described by the *Doehr* Court. *See Bowen v. Massachusetts,* 487 U.S. 879, 914, 108 S.Ct. 2722, 2742, 101 L.Ed.2d 749 (1988); *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).

   (3) *The Government's Interest.* The third consideration is " 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Doehr,* —— U.S. at ——, 111 S.Ct. at 2112 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). This factor encompasses a number of points.

   a. *Recognized Interest in the Property.* First, the Court has considered whether the party seeking to impose a lien on property has a recognized interest in the particular property which it is seeking to protect. *See Doehr,* —— U.S. at —— n. 4, ——, 111 S.Ct. at 2123 n. 4, 2121; *Mitchell v. W.T. Grant Co.,* 416 U.S. at 603, 94 S.Ct. at 1898. For example, in *Mitchell* the parties stipulated that defendant W.T. Grant Co., which had sold goods on installment to plaintiff Mitchell, had a vendor's lien on the goods. The Court found that an ex parte order to sequester those goods did not violate due process. *See Mitchell,* 416 U.S. at 604, 94 S.Ct. at 1898 ("The reality [in this case] is that both seller and buyer had current, real interests in the property. . . .

Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well."). In contrast, in *Doehr* the attached property served only to ensure the availability of assets to satisfy a possible judgment in a tort action unrelated to the property. *See Doehr*, —— U.S. at ——, 111 S.Ct. at 2115.

In this case, the government does not have any prior recognized interest in the Reardons' property. Under 42 U.S.C. § 9607(*l*), of course, a federal lien is created by operation of law before the government files a notice of lien. But that lien attaches to particular real property only if (1) the property is owned by a person who is liable to the United States for CERCLA clean-up costs, and (2) the property is "subject to or affected by a removal or remedial action." 42 U.S.C. § 9607(*l*)(1). The Reardons assert that they are not liable, and that some of the property on which a federal lien has been noticed has not been subject to or affected by a removal or remedial action. Nor has any court ever found that either of these conditions has been satisfied. Thus we cannot say that the government has a present, recognized interest in the property.

We believe this conclusion is consistent with the Court's remarks in *Doehr* about the *Spielman–Fond* case. The Court, explaining why its summary affirmance in *Spielman–Fond, Inc. v. Hanson's Inc.*, 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974), did not control in *Doehr*, stated:

> The facts of Spielman–Fond presented an alternative basis for affirmance in any event. Unlike the case before us, the mechanic's lien statute in Spielman–Fond · required the creditor to have a pre-existing interest in the property at issue. 379 F.Supp., at 997. As we explain below, a heightened plaintiff interest in certain circumstances can provide a ground for upholding procedures that are otherwise suspect.

*Doehr*, —— U.S. at —— n. 4, 111 S.Ct. at 2123 n. 4. In his concurrence, Chief Justice Rehnquist reiterates this distinction:

> But in Spielman–Fond, Inc., supra, there was, as the Court points out in fn. 4 [sic], ante, an alternate basis available to this Court for affirmance of that decision. Arizona recognized a pre-existing lien in favor of unpaid mechanics and materialmen who had contributed labor or supplies which were incorporated as improvements to real property. The existence of such a lien upon the very property ultimately posted or noticed distinguishes those cases from the present one, where the plaintiff had no pre-existing interest in the real property which he sought to attach.

*Id.* at ——, 111 S.Ct. at 2121 (Rehnquist, C.J., concurring). Although these comments are brief, we think the Court's reasoning is as follows. At the time *Spielman–Fond* was decided, the relevant Arizona statute provided:

> Every person who labors or furnishes materials, machinery, fixtures or tools in the construction, alteration, or repair of any building, or other structure or improvement whatever, shall have a lien thereon for the work or labor done of materials, machinery, fixtures or tools furnished.

Ariz.Rev.Stat. § 33–981 (1973). The landowners in *Spielman–Fond* apparently did not deny that "defendants Yanke and Hanson's furnished labor and materials to plaintiffs in connection with the development of plaintiffs' mobile home park." *Spielman–Fond*, 379 F.Supp. at 997. Thus, they could not deny that, under the terms of the Arizona statute, Yanke and Hanson's had a lien on the property. In the instant case, by contrast, the Reardons do not admit that the conditions under which the government would have a lien on their property are fulfilled.

Of course, the Reardons cannot claim that the underlying action is entirely unrelated to the attached property, as was the case in *Doehr*. But, taking the Reardons' contentions as true, a cleanup undertaken by EPA on portions of the Reardons' property is too minimal a connection to justify bootstrapping a lien on all the parcels.

Relying on the apparent constitutionality of a mechanic's lien as a basis for upholding the CERCLA lien fails for three further reasons. First, a *Spielman–Fond* type of mechanic's lien rests on a voluntary agreement between the contracting parties. Proof of an agreement establishes a connection between the parties, and, where the service has indisputedly been rendered, creates a rebuttable presumption of at least some liability on the part of the landowner. There is no such voluntary agreement here. Moreover, mechanic's lien statutes typically provide for dissolution of the lien unless the mechanic takes further action. For example, the Arizona statute in *Spielman–Fond* gave the property owner an opportunity to challenge the lien and provided a six month period after which the lien was dissolved if an action was not brought to enforce it. Ariz.Rev.Stat.Ann. § 33–998. *See also, e.g.,* Maine Rev.Stat.Ann. tit. 10, §§ 3253, 3255; Mass.Gen.L. ch. 254, §§ 8, 11; N.H.Rev.Stat.Ann. § 447:9. Finally, mechanic's liens, unlike CERCLA liens, are validated by their established place in the law of the land—pre-dating the Constitution itself.

■ b. *Exigent Circumstances.* The absence of notice and a hearing may be justified by exigent circumstances. As the Court said in *Doehr,* finding a lack of such circumstances:

> [T]here was no allegation that Doehr was about to transfer or encumber his real estate or take any other action during the pendency of the action that would render his real estate unavailable to satisfy a judgment. our cases have recognized such a properly supported claim would be an exigent circumstance permitting postponing any notice or hearing until after the attachment is effected. *See Mitchell, supra,* at 609, 94 S.Ct. at 1901; *Fuentes, supra,* at 90–92, 92 S.Ct. at 1999–2000; *Sniadach,* 395 U.S., 337 at 339, 89 S.Ct. 1820 at 1821, 23 L.Ed.2d 349. Absent such allegations, however, the plaintiff's interest in attaching the property does not justify the burdening of Doehr's ownership rights without a

hearing to determine the likelihood of recovery.

*Doehr,* —— U.S. at ——, 111 S.Ct. at 2115.

As in *Doehr,* there is nothing in this case suggesting that a transfer or encumbrance of the parcels retained by the Reardons was imminent. And a special feature of CERCLA makes a claim of exigent circumstances even less likely than in the usual lien case. Under the CERCLA liability provisions, any subsequent owner of property who knew at the time of purchase that hazardous wastes were located on the premises would become liable for cleanup costs, and the property could be sold to satisfy a judgment against that subsequent owner. *See* 42 U.S.C. § 9607. Hence, the transfer of property would likely affect the government's interest in recovering cleanup costs less than the average transfer would affect the interest of the average potential judgment creditor.

■ c. *The Added Burden of Additional Procedural Requirements.* The due process calculus also involves consideration of " 'the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Doehr,* —— U.S. at ——, 111 S.Ct. at 2112 (quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976)). In this case, the minimum additional procedural requirements would be notice of an intention to file a notice of lien and provision for a hearing if the property owner claimed that the lien was wrongfully imposed. This would seem to be a relatively simple matter. Moreover, the Constitution certainly allows the process due to be tailored to fit the realities of the situation. *Mitchell v. W.T. Grant Co.,* 416 U.S. at 610, 94 S.Ct. at 1901. For example, EPA may only need to demonstrate probable cause or reason to believe that the land would be "subject to or affected by" a cleanup, or that the landowner was not entitled to an "innocent landowner" defense.

Of course, EPA might seek to place a lien on property during the very early stages of a response action, when it did not have sufficient proof that a particular parcel of property was going to be "subject to

or affected by" that action. However, we do not believe that EPA has a legitimate interest in exceeding the limits of its authority under CERCLA, and we see nothing wrong with requiring EPA to delay filing a notice of lien until it can show that the statutory prerequisites for filing the notice have been satisfied.

EPA argues that the present case can be distinguished from *Doehr* in five respects: (1) the EPA's interest in the Reardons' property before attachment of the lien; (2) the availability of a Tucker Act damages action; (3) the presence of exigent circumstances; (4) the interest of the United States in protecting the federal fisc; and (5) the purportedly minimal risk of erroneous attachment in this case. Our discussion above has already addressed the first three of these arguments. We will now consider the last two.

It does not seem that the fact that the United States, rather than a private party, is seeking the lien, should weigh in favor of the statute's constitutionality. Indeed, since the due process clause protects against *government* deprivation, just the opposite would seem to be the case. There is one situation, the federal tax lien, where the government's financial well-being may justify the draconian deprivation of its citizens' property. But an EPA lien is not on the level of a federal tax lien. The tax lien is a law unto itself, and arises from administrative necessity (as well as direct constitutional authority, *see* U.S. Const. art. I, § 8) not present here.[3]

As for EPA's final point, we simply do not see how the risk of erroneous deprivation in this case can be characterized as minimal. Rather, the risk seems greater than it was in *Doehr*. In that case, a judge considered the merits *ex parte* before authorizing the attachment, the plaintiff could attain an immediate post-attachment hearing, and a double damage remedy was available to compensate for, and to deter, error. Here, there is no prior neutral proceeding, no double damage remedy, and no post-attachment review for what may be many years. Unless EPA is immune from error—which we doubt—the risk of mistake is not minimal.

## IV. CONCLUSION

In sum, we find that CERCLA § 9613(h) does not bar federal jurisdiction over the due process claim in this case; that the deprivation caused by the CERCLA lien is significant; that, at least when the landowner has raised a colorable defense, the issues may be quite factual; that the lien statute completely lacks procedural safeguards; that the government has no recognized pre-existing interest in the property; that the statute has no "exigent circumstances" requirement (nor have any such circumstances been shown in this case); and that additional procedural requirements are likely to place significant, but not overwhelming, administrative burdens on the government. As applied in this case, the statute thus deprives persons of property with far less process than the State of Connecticut provided in the attachment law found unconstitutional in *Doehr*. Thus, we are constrained to find that the CERCLA lien provisions, by not providing, at the very least, notice and a pre-deprivation hearing to a property owner who claims that the property to be encumbered is not "subject to or affected by a removal

---

**3.** *See, e.g., United States v. Snyder*, 149 U.S. 210, 214, 13 S.Ct. 846, 847–48, 37 L.Ed. 705 (1893), in which the Court held:

> The power of taxation has always been regarded as a necessary and indispensable incident of sovereignty. A government that cannot, by self-administered methods, collect from its subjects the means necessary to support and maintain itself in the execution of its functions is a government merely in name. If the United States, proceeding in one of their own courts, in the collection of a tax admitted to be legitimate, can be thwarted by the plea

of a state statute prescribing that such a tax must be assessed and recorded under state regulation, and limiting the time within which such tax shall be a lien, it would follow that the potential existence of the government of the United States is at the mercy of state legislation.

*Snyder*, 149 U.S. at 214, 13 S.Ct. at 847–48. *See also Phillips v. Commissioner*, 283 U.S. 589, 595 & n. 5, 51 S.Ct. 608, 611 n. 5, 75 L.Ed. 1289 (1931) (reviewing the history of tax collection via summary administrative proceedings).

or remedial action," violate the fifth amendment due process clause.

For these reasons, the judgment of the district court is *affirmed in part, reversed in part, and remanded for further proceedings.*

CYR, Circuit Judge (dissenting).

Although the majority makes a respectable case that 42 U.S.C. § 9613(h), as interpreted, violates the due process clause, I cannot accede to its failure to observe governing rules of statutory construction which warrant an interpretation more consonant with the CERCLA statute and the Constitution.

We are required to start with the well-settled theme that a court "will construe [a] statute to avoid [constitutional] problems *unless such construction is plainly contrary to the intent of Congress." Edward J. De Bartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) (emphasis added). Recognizing "that Congress, like [the judiciary], is bound by and swears an oath to uphold the Constitution[,] [t]he courts will ... not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Id.* Of course, the corollary "is that *every reasonable construction* must be resorted to, in order to save a statute from unconstitutionality." *Id.* quoting *Hooper v. California,* 155 U.S. 648, 657, 15 S.Ct. 207, 211, 39 L.Ed. 297 (1895) (emphasis added). Thus, the ultimate demonstration the majority must make is that every other reasonable interpretation of the terms "enforcement activity related to" a "removal or remedial action selected under section 9604" is plainly contrary to the intent of Congress. *De Bartolo Corp.,* 485 U.S. at 575, 108 S.Ct. at 1397.

We are required to respect a second settled tenet in determining whether there is an alternative interpretation more consonant with the Constitution. "[T]he 'starting point in every case involving construc-

tion of a statute is the language itself,' *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring) ... [but] ' " '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " ' " *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 357, 93 L.Ed.2d 216 (1986) (quoting *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221, 106 S.Ct. 2485, 2493, 91 L.Ed.2d 174 (1986) (in turn quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956) (in turn quoting *United States v. Heirs of Boisdore,* 8 How. 113, 122, 12 L.Ed. 1009 (1849)))).

Although sections 9613(h) and 9601(25), considered in isolation, might bear it, the interpretation adopted by the panel is unacceptable, as there exists an alternative at once constitutional and consistent with CERCLA's language, structure, policy and history.

> Section 9613(h) provides in relevant part:
> No Federal court shall have jurisdiction ... to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:[4]
>
> ....

42 U.S.C. § 9613(h). Under amended section 9601(25), "[t]he terms 'respond' or 'response' means remove, removal, remedy, and remedial action, all such terms (including the terms 'removal' and 'remedial action') include *enforcement activities* related thereto" 42 U.S.C. § 9601(25) (1986) (emphasis added). The panel concludes that section 9613(h) bars preenforcement review because its language, history and purpose make clear that a CERCLA lien is itself an "enforcement activity" within the meaning of amended section 9601(25). I am unable to agree, since some of the same considerations which prompt the panel to construe the statute as unconstitutional seem to me

---

**4.** The specific instances listed in § 9613(h) are    not implicated in the instant appeal.

to point to a reasonable interpretation consistent with the Constitution.[5]

First, the panel adopts what it considers the "ordinary meaning" of the term "enforcement activity," as including a CERCLA lien. Whatever other arguments there may be for such an interpretation, I must confess that I cannot think that "ordinary meaning" is among them. Under any ordinary understanding, CERCLA liens created by statute, *see* 42 U.S.C. § 9607(*l*), no more resemble "enforcement activities" than a mechanic's lien resembles a credit purchase of construction materials. Instead, I suggest, under any ordinary meaning "enforcement activities related" to "a removal or remedial action" are *activities* undertaken to *enforce* the *removal* of a contaminant or the *remediation* of its effects. It seems to me quite extraordinary to characterize a statutory lien as an *activity* of any kind, let alone as an activity to *enforce* a removal or remedial action.

The panel conclusion that "a lien on property to secure payment of [the costs of removal and remedial actions] ... *can reasonably* be described as seeking to enforce the liability provision," at 1512 (emphasis added), while true, is predicated on a misapprehension of the section 9613(h) bar, inso-

far as the panel fails to inquire whether a CERCLA lien is an activity related to the enforcement of a remedial or removal action, the only enforcement activities precluded from preenforcement review by virtue of section 9613(h). Although there surely is a "cause and effect" relationship between a removal or remedial action and the response costs it entails, to suggest that a CERCLA lien contingently securing the recovery of response costs enforces the removal or remedial action is to argue that aging enforces the passage of time.[6]

Second, the panel opinion correctly notes that the *primary purpose* of section 9613(h) is to *prevent delay* in the cleanup of hazardous substances which could endanger the public health. The panel concedes that preenforcement review of the validity of a CERCLA lien would in no way delay cleanup. The panel nevertheless concludes that a *secondary* purpose served by section 9613(h)—the prevention of piecemeal review—would be hindered if section 9613(h) were interpreted to permit preenforcement review of a CERCLA lien. It is nonetheless clear, however, that the constitutional challenge the panel entertains as a necessary consequence of its construction of the statute ensures no lesser incidence of piecemeal review. Unless the panel

---

**5.** The panel refrains from attempting to establish more than that the imposition of a CERCLA lien "can reasonably be described as [an enforcement activity]." More is required, however, "in order to save a statute from unconstitutionality." *De Bartolo Corp.*, 485 U.S. at 575, 108 S.Ct. at 1397 (quoting *Hooper*, 155 U.S. at 657, 15 S.Ct. at 211 ("every reasonable construction must be resorted to")).

**6.** Serious difficulties confound the effort to lump together attorney fees and CERCLA lien costs as "enforcement activities," on an "all or nothing" basis. *See* at 1514. First, since the CERCLA lien arises by operation of law, *see* 42 U.S.C. § 9607(*l*)(1), it entails only the *de minimis* expense associated with providing the landowner with a registered mail notice, *see id.* § 9607(*l*)(2)(B). The panel approach nonetheless assumes, absent historical evidence, that Congress considered recovery of these *de minimis* costs so compelling a concern as to warrant depriving innocent landowners of significant property rights *immediately, see id.* § 9607(*l*)(1) & (2), and *indefinitely, see id.* § 9613(g)(2), without due process of law, *see id.* § 9613(h).

I do not think it realistic to suppose that the congressional intent activating the 1986 amendment to § 9601(25) can be reliably determined without at least recognizing at the outset that CERCLA deprives no other potentially responsible party ("PRP") of any significant property interest without due process. All other PRP's are entitled to have any claim for response costs (and attorney fees) promptly determined by the court as part of the cost recovery action itself, *see id.* § 9613(g)(2). Nevertheless, and in stark contrast, the panel concludes that Congress clearly intended that an innocent landowner must wait years for the government to commence a cost recovery action before obtaining judicial review of the validity of the CERCLA lien encumbering his property. To suggest that Congress clearly intended that its amendment of § 9601(25) should be so interpreted merely because amended § 9601(25) was intended to permit recovery of attorney fees incurred in connection with a cost recovery action, utterly ignores the great disparity in the benefits and burdens at stake in these radically different contexts.

means to suggest that Congress has precluded any constitutional challenge to sections 9601(25) and 9613(h) however construed,[7] its interpretation would not prevent piecemeal litigation, since the panel entertains the present preenforcement challenge on constitutional grounds without apparent prejudice to a later challenge to the merits of a cost recovery action under sections 9607 and 9613(g)(2) & (h)(1).

The panel relies in particular on *Voluntary Purchasing Groups, Inc. v. Reilly,* 889 F.2d 1380 (5th Cir.1989). The primary concern in *Voluntary Purchasing* was that "[i]f [all potentially responsible parties] were allowed to file suits for declaratory judgment prior to cost recovery suits being filed by the EPA, much of the EPA's time and resources could end up being allocated to litigation in this area." *Voluntary Purchasing Groups,* 889 F.2d at 1390. But of course the concern over "crazy-quilt litigation" vanishes if the right to preenforcement review is restricted to alleged innocent owners of properties encumbered by CERCLA liens.

A further legislative purpose supposedly served by barring preenforcement review is avoidance of the difficulty of litigating the innocent owner issue, *see* 42 U.S.C. § 9607(a)(1) & (b), early in the response action when all the necessary facts may not be known. The panel concern is illusory. Relief from the CERCLA lien would either be deferred or denied until the owner was able to carry the burden of proving, *see id.* § 9607(b), innocent ownership. In any

event, there would be no delay or interference with any removal or remedial action. Furthermore, an alleged innocent owner's preenforcement challenge to the *validity* of a CERCLA lien, *see id.* § 9607(*l*)(1), as distinguished from the *amount* of damages and costs secured by it, *see id.* § 9607(a)(4) & (c), normally will present a very narrow and straightforward question. The CERCLA lien would be a valid encumbrance on the land as long as the owner could be liable for *any damages or costs. See id.* § 9607(*l*) ("*All* costs and damages for which a person is liable to the United States ... shall constitute a lien in favor of the United States upon all real property and rights to such property"). The litigation complexity to which the panel adverts consists in determining whether the Reardons are innocent owners as to any portion of their property "subject to or affected by a removal or remedial action." *See id.* § 9607(*l*)(1)(B). The far more problematic liability issue—the assessment and apportionment of the actual costs to be borne by each potentially responsible party ("PRP")—need not even be addressed in an action for review brought by an allegedly innocent owner.

Nor would preenforcement review impair the specific legislative purpose that prompted the amendment to section 9601(25), which was to "*confirm* the EPA's authority to recover *costs* for enforcement actions taken against responsible parties."[8] H.R.Rep. No. 99–253(I), 99th Cong., 2d Sess. 66–67 *reprinted in* 1986 U.S.Code Cong. & Admin.News 2848–2849 (emphasis

7. Were this the case, of course, the court would lack jurisdiction to consider, *sua sponte* or otherwise, the constitutional difficulties posed by *Connecticut v. Doehr,* 111 S.Ct. 2105 (1991). *See* 42 U.S.C. § 9613(h) ("*No* Federal court shall have *jurisdiction ... to review any challenges* to removal or remedial action selected under section 9604....") (emphasis added). The panel concludes, however, that since the statutes expresses no "clear congressional intent to preclude the type of constitutional claim the Reardons are making," a constitutional challenge to the lien provision is not barred by 9613(h), at 1514–1515. *See Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 2053–54, 100 L.Ed.2d 632 (1988) ("where Congress intends to preclude judicial review of constitutional claims its intent

to do so must be clear"). The problem with the attempted distinction between constitutional and other preenforcement challenges is that § 9613(h) bars "*any challenges* to removal or remedial action selected under section 9604...." (emphasis added).

8. Section 9613(h), as well as the amendment to § 9601(25), were enacted as part of the "Superfund Amendments and Reauthorization Act of 1986." P.L. 99–499. It is not altogether clear that an amendment meant to *confirm,* not *change,* existing law, should be applied to a lien provision added to the statute at the same time as the definitional change. Instead, it seems more likely that Congress may have focused exclusively on the confirmatory effect of the amendment on existing statutory provisions.

added). If a CERCLA lien is an "enforcement action," as the panel believes, then the mere sending of a registered mail notice to the owner, *see* 42 U.S.C. § 9607(*l*)(1) & (2)(A) & (B), automatically triggers a CERCLA lien, *see id.* § 9607(*l*)(1)(B), which remains uncontrovertible by the owner, at the option of EPA, until the expiration of the statute of limitations on a cost recovery action, *see id.* § 9613(g)(2). I cannot think the language of sections 9601(25) and 9613(h) so plainly evinces a congressional intent to include CERCLA liens as *enforcement* activities related to a removal or remedial action, when the effect would be to deny an innocent owner the right to obtain judicial review of an encumbrance on the entire property even though the only "activity" involved was the sending of a registered mail notice of lien to the owner.

Third, the panel relies on legislative history for its conclusion that section 9613(h) was intended to bar any preenforcement challenge to the validity of a CERCLA lien. *But see supra* note 7. The panel implicitly concedes that there is no evidence that Congress *intended* to bar an alleged innocent owner's preenforcement challenge to the validity of a CERCLA lien when it amended the scope of "removal" or "remedial" actions to include "enforcement activities related thereto." *See id.* § 9601(25). What the panel does not acknowledge is that there is no historical evidence that Congress ever *considered* whether or how section 9613(h) was to apply to a CERCLA lien challenge. *See supra* note 8 & accompanying text.

As the panel indicates, Congress did make clear its general purposes in enacting section 9613(h) and its intention to preclude PRP's in general from mounting judicial challenges to "their *potential liability* for a response action" prior to the completion of the cleanup. *See* 132 Cong.Rec. S14929 (daily ed. Oct. 3, 1986) (Sen. Thurmond); 132 Cong.Rec. H9582 (daily ed. Oct. 8, 1986) (Rep. Glickman) (emphasis added). Nevertheless, owners of properties encumbered by CERCLA liens comprise a tiny fraction of the total universe of PRP's, *see* 42 U.S.C. § 9607(a), whereas their property interests are burdened far earlier, longer and more severely than other PRP's, *see id.* § 9607(*l*)(1) & (2), who are nonetheless entitled to mount an immediate judicial challenge to their alleged liability for response costs as and when a recovery action is brought against them, *see id.* §§ 9613(h)(*l*), (4) & 9607, and before there has been any deprivation of their property rights.

Congress' reasoning regarding PRP's in general simply does not have meaning for those whose property is encumbered by a CERCLA lien. Congress perceived no need to permit PRP's to challenge their liability for costs and damages prior to the completion of the cleanup, because "plaintiffs concerned with the monetary consequences of a response can be made whole after the cleanup is completed by reducing the amount of the Government's recovery.... Delay in the timing of suits seeking monetary damages does not diminish the court's ability to grant later and adequate relief." 132 Cong.Rec. S14898 (daily ed. Oct. 3, 1986) (Sen. Stafford). The statement by Senator Stafford, a floor leader, demonstrates that Congress did not consider the plight of innocent owners indefinitely deprived of their property rights and the right to challenge an invalid CERCLA lien.

Innocent landowners whose property rights remain encumbered for years by a CERCLA lien are not seeking to challenge their potential liability for cleanup costs but to terminate the confiscatory effects of the invalid lien. Nor can an innocent owner be made whole by "reducing the amount of the Government's recovery," since the deprivation sustained by the innocent owner does not result from a recent assessment of unwarranted cleanup costs but from the inability to dispose of the encumbered property while awaiting EPA's discretionary initiation of an *in rem* action to recover on an invalid CERCLA lien. *See* 42 U.S.C. § 9607(*l*)(4). Thus, it is beyond the court's power to "grant later and adequate relief." *See Connecticut v. Doehr*, —— U.S. ——, 111 S.Ct. 2105, 2118, 115 L.Ed.2d 1 (1991) (White, J., plurality opinion) ("the right to be compensated at the end of the case ... for all provable injuries caused by

the attachment is inadequate to redress the harm inflicted, harm that could have been avoided had an early hearing been held."). The panel conclusion that the CERCLA lien provision is unconstitutional well demonstrates the great disparity between the interests and burdens of innocent owners and those of PRP's generally.

The panel interprets section 9613(h) "to bar review of pre-enforcement challenges to liens" because (1) this interpretation is "consistent with the language and the purpose of the judicial bar"; and (2) the court "cannot give the definition [of 'removal' and 'remedial' action] inconsistent readings within the statute." Slip op. at 12. The first point, even if correct, is not determinative unless any alternative interpretation is "plainly contrary to the intent of Congress." *See De Bartolo Corp.*, 485 U.S. at 575, 108 S.Ct. at 1397. As to the second point, while the panel appropriately eschews changing interpretations of the term "removal" and "remedial" action, that is not the statutory term on which its conclusion hinges; instead, it hinges on the term "enforcement activities related to" a removal or remedial action. Moreover, the panel opinion does not demonstrate that excluding CERCLA liens from the undefined term "enforcement activities" would render the statute internally inconsistent. As I regard it more consistent with the language, purpose and history of the statute, *see Kelly v. Robinson*, 479 U.S. at 43, 107 S.Ct. at 357, that a CERCLA lien not be considered an "enforcement activity," I believe that constitutional interpretation must be accepted. *See De Bartolo Corp.*, 485 U.S. at 575, 108 S.Ct. at 1397.

The constitutionality of the CERCLA lien provision depends on whether the notice of lien and the opportunity for judicial review satisfy the three part analysis articulated in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). As most recently explained in *Doehr*, due process analysis requires that the court balance

"the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards"; and lastly, "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Doehr*, 111 S.Ct. at 2112 (quoting *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903). As the Court has emphasized, the due process inquiry is fact specific. "Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334, 96 S.Ct. at 902. "[A]s applied to this case," *Doehr*, 111 S.Ct. at 2109, I believe that due process is satisfied by according the Reardons prompt judicial review of their innocent ownership claim.

I agree with the panel that the adverse effects of a CERCLA lien, indefinitely extended without the right to judicial review, would work a "significant" deprivation. I disagree, however, that there is a substantial risk of any unwarranted deprivation in the instant case, due to the very different purposes served by a CERCLA lien and the attachment lien involved in *Doehr*. Finally, I cannot agree that the government has no significant interest in the Reardons' property.

First, the Connecticut statute in *Doehr* permitted prejudgment attachment of the defendant's home to secure recovery of any future damage award to the plaintiff in an as-yet untried tort action. *Doehr*, 111 S.Ct. at 2113. The Supreme Court assumed that the statute permitted an attachment to issue on a sufficient showing that there was "probable cause" to believe that judgment would be rendered for the plaintiff. *Id.* 111 S.Ct. at 2114.[9] Since the "probable cause" determination in *Doehr* was based on the plaintiff's "one-sided, self-serving, and conclusory submissions," the Court

---

**9.** The statute in fact was unclear as to the showing required. The Supreme Court determined, however, that even a "probable cause" showing would not prevent a substantial danger of erroneous deprivation. *Doehr*, 111 S.Ct. at 2114.

found the "potential for unwarranted attachment ... too great to satisfy the requirements of due process absent any countervailing consideration." *Id.*

A CERCLA lien, however, is very different from the attachment lien in *Doehr*. The CERCLA lien encumbering the Reardon property has been administratively determined to require priority cleanup. The Reardon property has been determined to be contaminated by large quantities of polychlorinated biphenyls (PCBs) and has been placed on the National Priorities List pursuant to 42 U.S.C. § 9605. Two hundred thousand dollars have been spent on the cleanup of the property, and total cleanup costs at the site are estimated at over $16 million. The preparedness of the *lienor* to commit such sums to clean up the Reardon property on a priority basis provides a substantial safeguard against any erroneous determination as to the presence or location of hazardous substances at the cleanup site. Unwarranted cleanup costs would not be recoverable from the property owner. *See* 42 U.S.C. § 9607(a) & (*l*)(1). Similarly, the elaborate statutory safeguards the administrative procedures for selecting removal and remedial actions, *see, e.g., id.* §§ 9604, 9613(k) and 9621, afford extraordinary protection against any such egregious error as an unwarranted cleanup. Thus, it would seem almost fanciful to presume significant risk of an unwarranted CERCLA lien on property previously determined so severely contaminated as to require priority response action entailing a substantial investment of government resources.[10]

The danger of an unwarranted CERCLA lien is further reduced by the very different standards governing the enforceability of the CERCLA lien and the attachment lien involved in *Doehr*. The prejudgment attachment lien in *Doehr* would be unenforceable unless the plaintiff eventually prevailed on the tort claim as to which he bore the ultimate burden of proof. The CERCLA statute, on the other hand, makes the owner, *see id.* § 9601(20), liable under section 9607(a) for all costs and damages resulting from the cleanup, *see id.* § 9607(*l*)(1), *unless the owner can show* by a preponderance of the evidence, *id.* § 9607(b), that he is an innocent holder, an extremely difficult burden, *see id.* §§ 9607(b) & 9601(35). Thus, CERCLA imports a virtual statutory presumption that the lien is valid and enforceable absent a preponderance of evidence demonstrating not only the owner's lack of responsibility and knowledge of the wrongful disposal, but the absence of any reason to believe the property is contaminated. *See id.* §§ 9607(b) & 9601(35). Given the extremely demanding criteria for establishing innocent ownership, the danger of an unwarranted CERCLA lien is insignificant in comparison with the risk presented in *Doehr*.

The lesser risk of unwarranted attachment similarly affects the evaluation of the sufficiency of the statutory safeguards. Given that a CERCLA lien encumbers only the real property rights of the owner of the contaminated property, *see id.* §§ 9601(20) & 9607(*l*)(1), and that the ownership and location of property subjected to or affected by a response action are almost invariably ascertainable by recourse to EPA and real property records, a prompt postdeprivation hearing at the instance of a putative innocent owner would provide adequate protection and remediation of the short term effects of any mistaken encumbrance. Moreover, an innocent landowner in whose property the government proposes to invest more than $16 million normally would realize property improvements far in excess of any loss occasioned by any short term erroneous deprivation. Similarly, the absence of an indemnity bond seems immaterial where the federal government improves the affected property and remains answerable in damages.[11]

Finally, and perhaps most importantly, I cannot agree with the analysis of the gov-

---

**10.** The risk of unwarranted cleanup is even more fanciful in the instant case, as the Reardons admit ownership and do not contest the presence of contaminants on their property.

**11.** An action for damages under the Tucker Act, 28 U.S.C. § 1491(a)(1), would appear to provide an adequate compensatory remedy for loss or damage sustained due to any relatively brief, unwarranted deprivation resulting from a viola-

ernmental interest proposed by the panel. According to the panel, the government, like the plaintiff in *Doehr*, has no prior recognized interest in the liened property, slip op. at 29, because it has not yet been shown that the Reardons are liable for response costs.

First, the panel analysis overlooks the fact that property owners are answerable for response costs unless they can prove their innocence under the demanding standards prescribed in the statute. *See* 42 U.S.C. §§ 9607(b) & 9601(35). Second, the government has a legitimate interest in any incremental value occasioned by its cleanup of the Reardon property. Unlike the plaintiff in *Doehr*, whose "only interest in attaching the property was to ensure the availability of assets to satisfy his judgment if he prevailed on the merits of his action," *Doehr*, 111 S.Ct. at 2115, the government has expended more than two hundred thousand dollars in its cleanup effort to date and expects to expend millions more—substantial expenditures which should benefit the affected property significantly. The importance of according protection to the government's investment in the contaminated property is underscored by the fact that Congress amended the CERCLA statute to confirm EPA's right to recover "all costs of removal or remedial action." *See* 42 U.S.C. §§ 9601(25) & 9607(a)(4)(A).

The inability of the government to recover its costs from responsible parties would reduce the resources available for response actions at other contaminated sites. Congress enacted CERCLA to deal with "unfortunate human health and environmental consequences [of inactive hazardous waste disposal sites] ... amidst growing public and Congressional concern over the magnitude of the problem" and in recognition that "[e]xisting law [wa]s clearly inadequate to deal with this massive problem." H.R.Rep. No. 1016, 96th Cong., 2d Sess., pt. 1 at 17 (1980), *reprinted in* 1980 U.S.Code Cong. & Admin.News 6119, 6120. Since the CERCLA lien provision signifi-

cantly affects the EPA's financial ability to cope with a health and environmental problem so massive that it hardly admits of cost quantification, the existence of a substantial governmental interest in recouping CERCLA response costs from the affected property appears manifest.

Due process analysis requires that we consider the effects of the CERCLA lien on the Reardons' property rights, *as applied* in this case. In my opinion, considering the important governmental interests involved and the relatively insignificant risk of any unwarranted, uncompensable, short-term deprivation of the Reardons' property rights, a prompt postdeprivation hearing at the instance of the Reardons would satisfy the due process analysis required by *Doehr* and *Mathews*. As I believe the statute is reasonably interpreted as permitting a prompt postdeprivation challenge at the instance of innocent landowners and is therefore constitutional, I respectfully dissent.

---

tion of EPA regulations or the CERCLA statute. The Tucker Act provides:

> The United States Claims Court shall have jurisdiction to render judgment upon any claim against the United States founded either

upon the Constitution, or any Act of Congress or any regulation of an executive department ... or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).