**MANVILLE CORPORATION, Manville Sales Corporation (f/k/a Johns–Manville Sales Corporation), Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 91 Civ. 6683 (RWS).**

United States District Court, S.D. New York.

April 3, 1992.

As Amended April 8, 1992.

Davis Polk & Wardwell (Lowell Gordon Harriss, of counsel), Kaye, Scholer, Fier-man, Hays & Handler, New York City, for plaintiffs.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Edward A. Smith, Paula T. Dow, Paul K. Milmed, Asst. U.S. Attys., Daniel Pinkston, Trial Atty., Environmental Defense Section U.S. Dept. of Justice, of counsel), New York City, for the U.S.

## OPINION

SWEET, District Judge.

Defendant United States of America (the "Government") has moved for an order dismissing the declaratory judgment action brought by the Manville Corporation and the Manville Sales Corporation (collectively "Manville") on the ground that Manville's complaint is not yet ripe for adjudication. For the reasons set forth below, the Government's motion is denied.

*Prior Proceedings* [1]

On August 26, 1982, the Johns–Manville Corporation and its affiliated entities, including the Manville Corporation and the predecessors to Manville Sales Corporation, filed petitions under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, in the United States Bankruptcy Court for the Southern District of New York. This action was precipitated in part by the massive amount of liability Manville anticipated facing for personal injuries arising from asbestos exposure and asbestos-related property damage claims.

The Bankruptcy Court entered an order on July 16, 1984, fixing October 31, 1984, as the date by which claims had to be filed against Manville or be forever barred. The bar date was later extended to January 31, 1985. The order setting the bar date required Manville to conduct a notice campaign, pursuant to which notices were printed in numerous publications and mailed to over 23,000 entities, including the Administrator of the Environmental Protection Agency ("EPA") and all ten EPA regional offices. The Government failed to

---

1. The Prior Proceedings and Facts are drawn from both the allegations in Manville's complaint, which are treated as true for the purposes of this motion, and the affidavits both parties have submitted, which the Court may and has considered for purposes of this motion, *see Land v. Dollar*, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947).

file a proof a claim, either before or after the final bar date.[2]

Prior to entering bankruptcy, Manville had instituted litigation against the United States seeking contribution or indemnity from the Government for asbestos claims arising out of naval shipyards owned or controlled by the Government. One of the defenses the Government asserted in these actions was its sovereign immunity, which later proved to be successful. The Government probably would have waived this defense had it filed a proof of claim in Manville's bankruptcy proceedings, see 11 U.S.C. § 106, a fact the Government apparently was well aware of before the bar date, see Complaint ¶ 22.

The Bankruptcy Court confirmed Manville's Second Amended and Restated Plan of Reorganization on December 22, 1986. The order became final on October 28, 1988, and the reorganization plan consummated on November 28, 1988. Manville's obligations under the plan will continue until all asbestos health related claims have been provided for by the Manville Personal Injury Settlement Trust.

Manville commenced this adversary action on July 19, 1991, in Bankruptcy Court, to seek a declaratory judgment that the Government had bankruptcy claims against Manville with respect to four specific environmental clean-up operations, that the Government failed, deliberatively, to file a proof of claim, and that these claims have been discharged by the confirmation of the reorganization plan.

The Government filed its present motion on September 17, 1991. The parties then stipulated and moved to withdraw the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157. Their motion was granted and the reference withdrawn by the Honorable Jack B. Weinstein of the Southern and Eastern Districts of New York on October 9, 1991. On November 6,

1991, the matter was transferred to this Court's docket pursuant to Rule 16 of the Rules For the Division of Business Among District Judges of the Southern District. Oral argument was heard on January 9, 1992, and the motion considered submitted as of that date.

*Facts*

Manville seeks a judgment declaring that its liability to the Government under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 *et seq.* ("CERCLA"), and under other environmental statutes for four specific Superfund sites was discharged in bankruptcy. These four sites are: an asbestos mill, ponding basin, and the City of Coalinga, California ("Coalinga Asbestos Mill Site"); a landfill in Arapaho County, Colorado ("Lowry Landfill Site"); a paint stripping and solvent manufacturing and recycling facility in South Hope, Maine ("Union Chemical Site"); and a facility used to store transformers, liquids and other materials contaminated with polychlorinated biphenyls ("PCBs") in Baldwin, Florida ("Yellow Water Road Site"). The EPA has undertaken enforcement or response activities at each site.

Coalinga Asbestos Mill Site

From 1962 to 1974, the Coalinga Asbestos Company mined and milled asbestos on a plot of land approximately twenty miles from the City of Coalinga owned by the Southern Pacific Land Company. Johns–Manville Sales Corporation was an incorporator and shareholder of the Coalinga Asbestos Company.

The EPA first inspected the mill in 1973, apparently to check its compliance with national emission standards. The agency conducted another inspection of the site in May 1980, while in October 1980, the California Regional Quality Control Board inspected the mill to determine whether

---

**2.** The Government asserts that

The Complaint does not allege that the Debtors' respective bankruptcy petitions scheduled claims relating to environmental damages at any of the Sites.

... While some Government officials of course knew of the Manville reorganization proceedings and copies of the Bankruptcy Court's Bar Date Order may have been sent to the EPA, it does not appear that such Order was served on EPA as required by the Bankruptcy Rules, and the Complaint does not so allege.

Memorandum of Law 3 (Sept. 17, 1991).

waste discharges were in compliance with the state's environmental regulations. The state concluded that corrective measures were necessary to prevent asbestos from entering drainage basins. In April 1982, Southern Pacific and Manville submitted plans to the state proposing remedial actions that were never implemented due to Manville's subsequent bankruptcy filing.

The Coalinga Asbestos Mill Site was placed on the National Priorities List of hazardous wastes sites by the EPA in September 1984. The site consists of three distinct areas: the Coalinga mill area; a ponding basin of the California Aqueduct; and the City of Coalinga. The EPA states that it is studying and assessing the three areas separately. At the ponding basin, the EPA will evaluate the actions undertaken there by other state and federal agencies in 1992.

At the City of Coalinga, the EPA has completed a remedial investigation and feasibility study ("RI/FS"). The agency issued a Record of Decision ("ROD") on July 19, 1989, selecting a remedial plan of action for the area. The Southern Pacific Transportation Company has and will continue to execute the plan, and has reimbursed the EPA for its past response costs at the City of Coalinga.

The EPA informed Manville that it was a potentially responsible party ("PRP") for the mill area cleanup in 1988. On September 21, 1990, the agency issued a ROD for the site that estimated cleanup operations would take two years and cost at least $1.8 million.

On January 30, 1991, the EPA sent Manville and five other PRPs a letter entitled "Special Notice Letter for the Johns–Manville Coalinga Mill Area Operable Unit of the Coalinga Mine Superfund Site, Fresno County, California, and Demand for Payment" ("Coalinga Mill Letter"). Invoking the provisions of CERCLA § 122(e), 42 U.S.C. § 9622(e), the letter sought to "expedite the remedial process and facilitate a settlement". Coalinga Mill Letter 2. The letter requested the PRPs collectively submit a "good faith" settlement offer stating, among other things, their willingness and ability to undertake remedial action. If accepted after negotiations, the settlement would be embodied in a consent decree between the PRPs and the EPA that would not be binding on the Government until approved by the agency and the Department of Justice. See id. at 2–3. The letter also "demanded" the reimbursement of costs of $1,531,947.30 already expended by the Government in its response action and interest from the date the letter was received, pursuant to § 107(a), 42 U.S.C. § 9607(a). Coalinga Mill Letter 3–4.

Three of the mill area PRPs, not including Manville, submitted a good faith offer to the EPA on April 9, 1991. They subsequently signed a consent decree in July 1991, which also was signed by the EPA in September 1991 but has not yet been approved by the Department of Justice nor a federal court. See § 122(d); 42 U.S.C. § 9622(d).

On March 26, 1991, Manville responded to the Coalinga Mill Letter with a letter stating that Manville believed its liability had been fully discharged in the bankruptcy proceedings. Manville alleges that after the EPA received its response, the agency advised Manville that it would issue a Unilateral Administrative Order against Manville pursuant to § 106(a), 42 U.S.C. § 9606(a). In late September, 1991, however, an EPA official advised Manville that, after the complaint in this action was filed, she was told not to take any further enforcement action against Manville. Ray Affidavit ¶ 5.

Lowry Landfill Site

Between July 1977 and November 1980, the Waste Transport Company allegedly delivered liquid sludge from the Manville Technical Center to the Lowry Landfill in Colorado. The EPA began an investigation of the landfill in 1981 and may have known of possible Manville contributions to the landfill in 1983.

Manville received requests for information concerning the landfill from the EPA in 1985 and 1986. After examining its records to no avail, Manville responded that it had no knowledge or records of any waste shipments by it to the site from 1966

to 1980. The EPA therefore did not list Manville as a PRP for Lowry Landfill.

In 1990, the EPA allegedly received documents from a third party showing that the Waste Transport Company had delivered wastes from Manville to Lowry Landfill from 1977 to 1980. The agency therefore notified Manville that it was a PRP in a letter dated December 7, 1990, and that Manville had contributed 702,761 gallons of waste water and oil to the landfill. This figure was revised downward to 250,000 gallons in May 1991.

The EPA has initiated *de minimis* settlement negotiations with the Lowry Landfill PRPs. *See* § 122(g), 42 U.S.C. § 9622(g) At first, Manville was not eligible to participate in these discussions, but became potentially eligible when the EPA revised its estimate of Manville's volumetric contribution to the site On August 1, 1991, the EPA set the final eligibility requirements for participating in the Lowry Landfill *de minimis* settlement. To participate, a PRP must meet three requirements: (1) its § 104(e) response must be adequate and complete; (2) its volumetric contribution to the landfill must be 300,000 gallons or less; and (3) it must not be involved in any litigation against the EPA concerning Lowry Landfill. It apparently is the EPA's position that Manville was eligible to participate in the *de minimis* settlement before it filed the present complaint, and that, unless it drops the allegations regarding the landfill, it is now barred from participating. Ray Affidavit ¶ 7.

The EPA has incurred roughly $19 million in response costs at the Lowry Landfill Site. Manville estimates that the ultimate response costs for the site will approach $500 million.

Union Chemical Site

The Union Chemical Company owned and operated a paint stripping and solvent manufacturing business at the Union Chemical Site from 1967 to 1986. Beginning in 1969, Union Chemical also operated a solvent recovery facility at the site. Manville's Lewiston, Maine, roofing plant allegedly sent 6,450 gallons of waste solvents to the site between 1979 and 1984. The Maine Department of Environmental Protection discovered groundwater contamination at the site in 1979.

The EPA has been active at Union Chemical since 1984. On March 23, 1987, the agency notified Manville that it was a PRP. The State of Maine, the EPA, and approximately 288 PRPs, including Manville, reached a settlement concerning the Union Chemical Site in 1987 by which the PRPs agreed to reimburse the state and the EPA for response costs incurred for past cleanup activities and to finance an RI/FS. The Union Chemical Site was listed on the National Priorities List in October 1989.

The RI/FS was completed in 1989, and the EPA signed a ROD for the site on December 27, 1990. The estimated cost of implementing the ROD is $10–$15 million.

On February 28, 1991, the EPA sent Manville and about 400 other PRPs a letter entitled "Special Notice Pursuant to Section 122(e) of CERCLA for Remedial Design/Remedial Action at the Union Chemical Company, Inc. Site in South Hope, Maine" ("Union Chemical Letter"). This letter contained:

a formal demand for reimbursement of the costs, including interest thereon, that have been incurred and that are expected to be incurred in response to the environmental problems at the site [pursuant to § 107(a)]. This letter also provide[d] notice of a period of negotiations seeking [Manville's] voluntary participation in the performance or financing of the remaining response actions necessary at the Site.

Union Chemical Letter 1. The amount of costs that the EPA had incurred by that time was $1.75 million. The type of negotiations suggested is similar to the "good faith" procedures set forth in the Coalinga Mill Letter. The Union Chemical Letter also stated that the EPA was considering a *de minimis* settlement. *See id.* at 5.

On May 22, 1991, Manville responded to this letter by again notifying the EPA that it believed the Government's claims were discharged in bankruptcy. On August 8, 1991, the EPA, the state, and 60 PRPs

other than Manville reached a settlement by which these PRPs agreed to perform the selected remedy and to reimburse a portion of the response costs incurred. The underlying consent decree was lodged with the United States District Court for the District of Maine on December 4, 1991.

Yellow Water Road Site

The American Environmental Energy Corporation owns the Yellow Water Road Site. In 1981, it entered into a joint venture with the American Electric Corporation for the purpose of developing a PCB incinerator on the site. As part of the venture, PCB-contaminated liquids and equipment were sent to and stored at the site.

Manville's Green Cove Springs, Florida, pipe plant was a customer of the American Electric and sent wastes to American Electric's Ellis Road facility. American Electric in turn sent the wastes to the Yellow Water Road Site.

The EPA commenced a criminal investigation against American Electric in 1982 that partially involved its disposal of wastes at Yellow Water. American Electric eventually was acquitted, and the EPA initiated a removal action at the site in November 1984. Due to the threatened release of PCBs at the site, the EPA conducted an emergency response between December 1984 and June 1985, incurring costs. The EPA listed the Yellow Water Road Site on the National Priorities List on June 10, 1986.

In March 1987, the EPA sent information requests to a number of PRPs, including Manville. A steering committee was formed by 53 of the PRPs, and the chairperson of the committee notified Manville of its PRP status in April 1987. The EPA and the steering committee entered into an Administrative Order by Consent in September 1987 by which the committee agreed to perform a RI/FS. The report was submitted to the EPA in 1990 and the agency selected a remedy for soil contamination in a ROD dated September 28, 1990. The site has been divided into two cleanup units, one for soil contamination and one for groundwater contamination. A remedy for the groundwater contamination has not been chosen yet.

Pursuant to § 106(a), 42 U.S.C. § 9606(a), the EPA issued a Unilateral Administrative Order for Remedial Design ("Yellow Water Order") on March 5, 1991, directing Manville and 87 other PRPs to perform the remedial design specified in the ROD. Manville again responded by asserting that the EPA's claim had been discharged in bankruptcy, in addition to a number of other defenses.

The order states that:

[u]nder Section 106(b) of CERCLA, 42 U.S.C. § 9606(b), Respondents shall be subject to civil penalties of not more than $25,000 for each day in which a violation of this Order occurs or a failure to comply continues. Failure to comply with this Order, or any portion hereof, without sufficient cause, may result in liability under Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3), for punitive damages in an amount at least equal to, and not more than, three times the amount of any costs incurred by EPA as a result of such failure to comply.

Yellow Water Order 20–21. Most of the PRPs are in compliance with the order, but not Manville. On December 10, 1991, the EPA amended the Yellow Water Order to delete Manville from the list of respondents subject to its terms, effectively withdrawing the order against Manville.

*Discussion*

Relying principally on *In re Combustion Equipment Associates, Inc.*, 838 F.2d 35 (2d Cir.1988), the Government contends that Manville's complaint for a declaratory judgment must be dismissed since the underlying dispute is not ripe for adjudication. Indeed, the Government asserts that the panoply of remedies available to it under CERCLA and CERCLA itself mandate that this dispute will not be justiciable until the EPA initiates a judicial enforcement action, if ever.

Manville's complaint places the Court precisely at "the intersection of bankruptcy law and environmental law". *In re Chateaugay Corp.*, 944 F.2d 997, 999 (2d Cir.

1991). The intersection is not a harmonious one; each set of laws directs a decision-maker towards competing objectives and policies. *See id.* at 1002. Simply put, the Bankruptcy Code seeks to provide a debtor with a "fresh start" as fast as possible, while CERCLA seeks to postpone the inception of litigation as long as possible by focusing on remedial activities. *See generally id.; Combustion Equipment,* 838 F.2d at 37; Drabkin, Moorman & Kirsch, *Bankruptcy and the Cleanup of Hazardous Waste: Caveat Creditor,* 15 Envtl. L.Rep. (Envtl.L.Inst.) 10168 (1985); Note, *Dividing the Toxic Pie: Why Superfund Contingent Contribution Claims Should not be Barred by the Bankruptcy Code,* 66 N.Y.U.L.Rev. 850 (1991). Further compounding this action are the separate policies of the Declaratory Judgment Act, 28 U.S.C. § 2201. *See Combustion Equipment,* 838 F.2d at 36.

## I. Statutory Jurisdiction

The exercise of a court's power to issue a declaratory judgment is discretionary, and whether a court exercises that power is frequently controlled by whether an underlying controversy is ripe. *See* 28 U.S.C. § 2201(a); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *Combustion Equipment,* 838 F.2d at 37. Ripeness itself, though, also can be constitutional limit on a district court's jurisdiction. *See* U.S. Const. art. III, § 2. Before addressing the constitutional issue and deciding whether this particular controversy is ripe, however, it would be more prudent to first determine whether jurisdiction over the matter has been statutorily precluded, assuming the underlying controversy is ripe.

Manville's Complaint alleges that "[t]his Court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 157, 1334 and 2201; Bankruptcy Rule 7001; [and] paragraphs 28(b), (f) and (k) of the Order of Confirmation". Complaint ¶ 3. Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases

under title 11" Section 2201 (the Declaratory Judgment Act) further provides that:

In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of Canadian merchandise, as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. None of the exceptions set forth in the Declaratory Judgment Act apply here. Therefore, as this action is an adversarial proceeding squarely arising out of and related to Manville's title 11 proceedings, Manville has pleaded a proper jurisdictional predicate.

■ The Government contends, however, that CERCLA § 113(h) precludes the Court from exercising jurisdiction over the Complaint. Section 113(h) provides that:

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, in any action except one of the following:

(1) An action under section 9607 of this title to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

(3) An action for reimbursement under section 9606(b)(2) of the title.

(4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

CERCLA § 113(h), 42 U.S.C. § 9613(h). These broad restrictions on a court's ability to review the Government's actions in the CERCLA context run to the core of CERCLA's policy of executing cleanup efforts as quickly as possible without the delay imposed by piecemeal litigation. *See Voluntary Purchasing Groups, Inc. v. Reilly,* 889 F.2d 1380, 1385–90 (5th Cir.1989); Note, *supra,* at 859–63; *cf. Wagner Seed Co. v. Daggett,* 800 F.2d 310, 314–15 (2d Cir.1986). The Government thus argues that this Court cannot review the allegations within Manville's Complaint since the EPA has not initiated a judicial enforcement action against Manville.

"Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of its statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* 467 U.S. 340, 345, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984); *see also Traynor v. Turnage,* 485 U.S. 535, 542, 108 S.Ct. 1372, 1378, 99 L.Ed.2d 618 (1988) ("The presumption in favor of judicial review may be overcome 'only upon a showing of "clear and convincing evidence" of a contrary legislative intent'" (citations omitted)). No doubt were Manville contesting whether it had contributed to the wastes at the sites or challenging the methods the EPA used to remedy the site, § 113(h), would bar this action. *See Reardon v. United States,* 947 F.2d 1509, 1512–14 (1st Cir.1991) (en banc); *Voluntary Purchasing Groups,* 889 F.2d at 1390–91.

Expansive legislative history and purposes not to the contrary, § 113(h) does not, however, paint with as broad a brush as the Government suggests. By its terms, the statute limits review of "any challenges to removal or remedial action selected under section 9604 of this title". 42 U.S.C. § 9613(h); *Reardon,* 947 F.2d at 1515. The statute therefore must yield to allow review in situations not within its reach. *See id.* at 1514–17; *Chateaugay Corp.,* 944 F.2d at 1006.

In both *Combustion Equipment* and *Chateaugay Corp,* the Second Circuit noted the breadth of § 113(h), but did not apply it. *See Chateaugay Corp.,* 944 F.2d at 1006; *Combustion Equipment,* 838 F.2d at 37. The *Combustion Equipment* court only mentioned the statute in passing in affirming the district court's dismissal of a declaratory judgment action on narrowly-drawn ripeness grounds. *See id.* at 41.

The *Chateaugay Corp.* court found the statute to be inapplicable to a pre-confirmation adversary proceeding in bankruptcy. The EPA initiated the action within the debtor's Chapter 11 proceedings, seeking a declaratory judgment that response costs incurred post-confirmation are not dischargeable. The Government argued that § 113's ban on pre-enforcement review required that it receive a judgment in its favor. The Court of Appeals rejected this contention, noting that it had not been asked "to 'review any challenges to removal or remedial action [under § 104] or to review any order issued under [§ 106(a)]'". 944 F.2d at 1006 (quoting 42 U.S.C. § 9613(h)). Rather, the court noted that "nothing prevents the speedy and rough estimation of CERCLA claims … with ultimate liquidation of the claims to await the outcome of normal CERCLA enforcement proceedings". *Id.* It therefore declined to decide whether CERCLA impliedly repealed authority conferred on federal courts by the Bankruptcy Code. *Id.; see also Reardon,* 947 F.2d at 1517 (§ 113(h) does not preclude judicial review of due process challenge of CERCLA).

The Government argues that because Manville seeks a post-confirmation dischargeability determination, *Chateaugay Corp.* does not apply and the Bankruptcy Code's policy of accelerated litigation is not implicated. However, the distinctions between the form of this action and that of *Chateaugay Corp.* do not require that Chapter 11's chief policy of providing the debtor with a fresh start be ignored. Indeed, accelerated litigation often is just a mechanism by which to achieve a fresh start while preserving as many of the debtor's assets as possible. *See* Note, *supra,* at 869. The broad sweep of the Bankruptcy Code obviously is in conflict with CERCLA's objectives. But absent clear and convincing evidence that Congress wished to preclude review of the dischargeability of environmental claims, this Court should not reach to create an exception to Bankruptcy's across-the-board legislative scheme to advance the objectives of another statute. *Chateaugay Corp.,* 944 F.2d at 1002.

Here, Manville primarily seeks a determination of whether the Government had claims against Manville and if so, whether those claims have been discharged. The Complaint seeks a declaration of the scope of Manville's chapter 11 reorganization, a proceeding specifically contemplated by the Bankruptcy Code and the Declaratory Judgment Act, *see* 28 U.S.C. § 2201, Bankr.R. 7001(6), (9), and does not fall within the terms of § 113(h). Moreover, a complete ban on this type of proceeding does not appear on the face of the Declaratory Judgment Act, *see* 28 U.S.C. § 2201(a), although others do, leading to the conclusion that a complete ban was not intended. *See Chateaugay Corp.,* 944 F.2d at 1006; *In re Charter Co.,* 862 F.2d 1500 (11th Cir.1989); *cf. Combustion Equipment,* 838 F.2d at 37. The Government's ripeness contention therefore must be addressed.

## II. Ripeness

### A. *Combustion Equipment*

■ In *Combustion Equipment,* the Second Circuit was faced with a record comparable to the one presented here.

There, Carter Day brought an adversary proceeding against the Government seeking a declaratory judgment that any CERCLA liability it may have had for two landfills in New Jersey had been discharged in its Chapter 11 proceedings.

Carter Day filed for reorganization in 1980. Its bar date was fixed as October 29, 1982, and its reorganization plan confirmed in December 1983. In September and October 1983, the EPA notified Carter Day that it was a PRP for the cleanup of the landfills. The landfills were operated by a subsidiary of Carter Day that was liquidated under Chapter 7 of the Bankruptcy Code. Hazardous wastes were discovered in the groundwater at both sites. The State of New Jersey had filed a proof of claim against Carter Day, but the claim was disallowed prior to confirmation under New Jersey law.

The EPA funded a RI/FS at the sites that was completed in May 1986. Fearing liability, Carter Day initiated an adversary proceeding against the EPA and the New Jersey Department of Environmental Protection in June 1986 seeking a declaratory judgment that any CERCLA claims the agencies may have had against Carter Day were discharged in bankruptcy. A ROD based upon the RI/FS was issued by the EPA in September 1986.

The district court withdrew the reference and then dismissed the Carter Day's complaint on ripeness grounds. *See* 73 B.R. 85 (S.D.N.Y.1987). Applying the two-pronged ripeness test set forth in *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16, for use in the administrative context, the Court of Appeals affirmed.

*Abbott Laboratories* requires a court to examine both the fitness of the issue presented for judicial review and the hardship to the parties if consideration of the issue is withheld. The Combustion Equipment court employed two factors in determining whether the issue was fit for review: (1) whether the EPA's actions were final[3] and (2) whether the issue presented was purely legal. *See* 838 F.2d at 37–38.

---

3. The Administrative Procedure Act, 5 U.S.C. 

§ 701 *et seq.,* was not implicated in *Combustion*

The Second Circuit first held that the EPA's issuing of the PRP letter to Carter Day was "not a final, definitive ruling with the status of law demanding immediate compliance since it does not impose any liability on Carter Day". *Id.* at 38. Rather, the court found that the only requirement the letter imposed on Carter Day was that it answer seven questions concerning the site. The court also relied on the fact that the over 190 PRP letters were sent out for the two landfills to parties who were "*potentially* responsible" and " '*may* be liable' ". *Id.* (emphasis in original).

The court next held that a purely legal issue was not presented. It noted that under *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the ultimate legal arguments, *i.e.* whether a claim exists and has been discharged, *see Chateaugay Corp.,* 944 F.2d at 1009, may depend on the ultimate enforcement action the EPA takes. Since the EPA's activities were at a relatively early stage in the CERCLA scheme, the eventual enforcement action it would take against Carter Day, if any, could not be forecasted. *Combustion Equipment,* 838 F.2d at 39.

Lastly, the court held that any impingement on Carter Day's fresh start caused by the PRP letter was outweighed by other factors. First, the court noted that any potential hardship was speculative absent EPA action and that even the presence of some possible harm does not render a dispute ripe. Second, the court found Carter Day's concern "disingenuous" given its failure to include its potential liability in the schedule of liabilities during the reorganization proceedings. Third, the court held that the alleged hardship was outweighed by the potential hardship to the EPA and Superfund if PRPs were allowed to challenge the EPA at such an early stage. *Id.* at 39–40. Thus, under *Abbott Laboratories,* the court found the dispute to be not ripe for adjudication.

*Equipment* because Carter Day's complaint did not seek review of the *propriety* of the EPA's acts. 838 F.2d at 38. Likewise, the finality

### B. *The Present Dispute*

Although the parties agree that the CERCLA activities here have proceeded to a more advanced state than that at issue in *Combustion Equipment,* the Government contends that this action cannot be considered ripe until the EPA institutes a "final" judicial enforcement action against Manville and that the EPA will suffer a greater hardship than Manville if forced to litigate Manville's liability at this stage. Manville asserts that the action is ripe since the Government has effectively backed it into a corner at the four sites by demanding specific sums from Manville and by issuing specific orders and taking coercive actions against Manville.

Because of the EPA's more advanced activities at the four sites, *Combustion Equipment* does not squarely control the present action. *See Combustion Equipment,* 838 F.2d at 41. Therefore, to determine whether the present action is ripe, the Court must examine Manville's Complaint under the test set forth in *Abbott Laboratories,* with *Combustion Equipment* serving as a guide.

#### 1. Fitness for Judicial Review

The Administrative Procedure Act is not implicated here, *see Combustion Equipment,* 838 F.2d at 38. Therefore, the three-part test used to determine whether an agency's actions are final, *see FTC v. Standard Oil Co.,* 449 U.S. 232, 240–43, 101 S.Ct. 488, 493–95, 66 L.Ed.2d 416 (1980); *Pacific Resins & Chemicals Inc. v. United States,* 654 F.Supp. 249, 252–53 (W.D.Wash.1986), does not apply. The Government, nevertheless, asserts that the first prong of that test should control this action, and that the Complaint should be dismissed since "there has not been a 'final, definitive ruling with the status of law' ". Reply Memorandum of Law 16 (quoting *Combustion Equipment,* 838 F.2d at 38). If this Court were to adopt the Government's artful editing of the Second Circuit's opinion as law, the Declaratory Judgment Act would be rendered a nullity

requirement of the Administrative Procedure Act is not implicated here.

in this context because, under CERCLA, "true" finality would not exist until the EPA initiated an enforcement action. This outcome is rejected.

First, pre-enforcement judicial review of CERCLA claims is allowed in the bankruptcy context. *See Chateaugay Corp.*, 944 F.2d at 1008. Therefore, to the extent there is a clash between the Bankruptcy Code and CERCLA in this context, CERCLA does not completely override the Code.

Second, absolute finality is not a requirement. Instead, threatened enforcement or the need for a party subject to a statute or regulation to go to great lengths to prepare for the eventual enforcement of an agency's definitive action often will suffice. *Compare, e.g., Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 201–02, 103 S.Ct. 1713, 1721, 75 L.Ed.2d 752 (1983) (years of advance planning and development required before certification of nuclear power plant rendered controversy over certification moratorium ripe) and *Lake Carriers' Association v. MacMullan*, 406 U.S. 498, 507–08, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972) (although enforcement of environmental statute postponed, threat of future enforcement still forced plaintiffs to attempt to comply, creating immediate and real controversy) *and Abbott Laboratories*, 387 U.S. at 152–53, 87 S.Ct. at 1517 (controversy existed where plaintiff either had to change operations to meet regulations or risk criminal or civil penalties for noncompliance) *with Pacific Gas & Electric*, 461 U.S. at 203, 103 S.Ct. at 1721 (challenge to statute providing for interim storage of nuclear fuel not ripe because statute called for case-by-case determinations and it was not known whether commission would ever find a plant's capacity to be inadequate) *and Toilet Goods Association v. Gardner*, 387 U.S. 158, 162–63, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967) (although agency action "final" whether enforcement actually would take place was uncertain).

Third, a declaratory judgment action is more fit for judicial review if it raises primarily legal issues. If factual issues are raised, the action is more fit for review if the issues arise out of events that have already occurred, thus providing a more concrete framework for the legal issues presented. *See Combustion Equipment*, 838 F.2d at 39–40.

Here, the EPA has not just identified Manville as someone who may be liable along with a large number of other potentially responsible parties. At each site in question, the EPA has either threatened Manville with enforcement or has initiated coercive settlement processes unique to CERCLA that can severely jeopardize Manville's interests if it exercises its right not to participate. *See* 42 U.S.C. § 9622; Neuman, *No Way Out? The Plight of the Superfund Nonsettlor*, 20 Envtl.L.Rep. (Envtl.L.Inst.) 10295 (1990).

■ For example, the Coalinga Mill Letter stated that the EPA was invoking CERCLA § 122 to expedite the remedial and settlement processes. The object of doing so is to reach a settlement within 120 days that will be entered as a consent decree between the parties. If a collective good faith offer is not made, "EPA will take appropriate measures," Coalinga Mill Letter 2, and if all of the PRPs do not participate, "EPA will seek the participation of the remaining parties," *id.* at 3. Failure to settle can have dire consequences. Under § 122, settling parties can receive releases from future CERCLA liability and are shielded from contribution claims from nonsettling parties, *see* § 122(f), (h)(4), 42 U.S.C. § 9622(f), (h)(4). Nonsettling parties, however, might be held jointly and severally liable for the remaining clean-up costs. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1198 (2d Cir.1992); Neuman, *supra*, at 10300–03.

The letter places Manville squarely on the horns of a dilemma. It can opt to settle, assuming responsibility for a significant amount of clean-up costs and waiving what it considers to be a strong defense, or it can wait, potentially exposing itself to almost limitless liability for clean-up costs

beyond the scope of any settlements.[4] The EPA's argument that it may never choose to initiate an enforcement action if Manville decides not to participate in the settlement is disingenuous. The letter is plainly final in threatening future enforcement actions against Manville unless it chooses the path of least resistance and settles. In this sense, therefore, the EPA's actions are final and Manville's liability fit for judicial review.

Moreover, the Coalinga Mill Letter explicitly states the "with this letter EPA demands that you [Manville] reimburse EPA for its costs incurred to date and future response costs incurred by EPA pursuant to Section 107(a) of CERCLA." Through November 30, 1990, these costs were $1,531,947.30, and interest is to be calculated from the date the letter was received by Manville. *Id.* at 3–4. The letter does not qualify this demand for payment. The EPA's actions at the mill area of the Coalinga Asbestos Mill Site are therefore sufficiently final for review.

For essentially the same reasons, the EPA's actions in terms of Manville's liability at the Union Chemical Site are also sufficiently final as well. The Union Chemical Letter also sought a settlement, with the same results, and contained a formal demand for payment not unlike that in the Coalinga Mill Letter.

At the Lowry Landfill Site, the EPA has determined Manville's volumetric contribution of wastes to the site and has sought to compel Manville to participate in *de minimis* settlement negotiations. Since the EPA has determined the percentage of waste in the landfill attributable to Manville, it no doubt has determined Manville's liability. Yet the EPA has barred Manville from participating in the settlement negotiations unless Manville waives its defense to liability and incurs costs. Again Manville is forced to choose between paying a sum certain now in spite of its defense or potentially exposing itself to joint and several liability for that indivisible portion of the

estimated $500 million clean-up cost for this site not satisfied through the settlement process.

The EPA previously issued a Unilateral Administrative Order for Remedial Design against Manville for the first clean-up unit at the Yellow Water Road Site. The order specifically required Manville and other PRPs to comply with its terms or face fines and punitive damages. Although Manville was recently deleted from the order, that the EPA originally issued the order against Manville implies that the agency has determined with some certainty that Manville is liable for the site. The agency's actions at these two sites therefore are sufficiently final as well.

Although the Complaint does not raise purely legal issues, *see e.g., Pacific Electric & Gas*, 461 U.S. at 201, 103 S.Ct. at 1720–21 (preemption), the facts upon which the legal determinations would be made stem mostly from the past and are fit for a declaratory judgment. *See, e.g., Chateaugay Corp.*, 944 F.2d at 1001; *In re Jensen*, 127 B.R. 27 (Bankr. 9th Cir.1991). To the extent there is a concern that legal determinations may be based on what kind of enforcement actions the EPA takes in the future, *see Chateaugay Corp.*, 944 F.2d at 1006–09, it should be noted that the EPA initiated the adversary declaratory judgment action at issue in *Chateaugay Corp.*, and that the timing of the actions in terms of the EPA's enforcement activities there is similar to that here. This issue did not seem to be of much concern pre-petition, and it is difficult to see why it should be otherwise post-petition.

The EPA therefore has undertaken enforcement actions at each of the sites at issue that has the effect of imposing final liability, and the legal issues presented turn on facts primarily based in the past. The questions presented within Manville's Complaint are thus fit for judicial review. *Lake Carriers' Association*, 406 U.S. at 507, 92 S.Ct. at 1755–56.

---

**4.** Three of the mill area PRPs have signed a consent decree but the decree itself has not been fully approved.

### 2. Hardship to the Parties

The second prong of the ripeness test requires the Court to analyze the hardship to the parties. *See Combustion Equipment*, 838 F.2d at 39. The Government asserts that, because CERCLA's remedial scheme would be jeopardized by allowing an inquiry to occur at this time and because Manville failed to schedule its environmental liabilities, the harm to the EPA and CERCLA outweigh any harm suffered by Manville. *See id.* at 39–40.

The Government's argument ignores the differences between the state of the proceedings in *Combustion Equipment* and here. First, the EPA's enforcement activity has advanced well beyond the initial PRP stage at issue in *Combustion Equipment*. Second, Manville's bankruptcy was by no means a run of the mill reorganization, and it would be facetious for the Government to claim it was unaware of those proceedings. Although Manville may be subject to some criticism for failing to schedule these liabilities, Manville alleges that the Government's hands may also be far from clean.

Furthermore, the carefully constructed reorganization, as well as the future of the asbestos-claims fund, may realistically be threatened by the EPA's actions. Both are threatened by Manville's inability to determine on its own the answers to the questions presented here, which prevents it from carefully choosing from among the options available to it. A wrong move has the potential of rendering Manville's reorganization one of the biggest wastes of judicial resources ever, and of wiping out the asbestos-claims fund in short order. Manville presently is subject to increasing fines and penalties and the threat of the CERCLA settlement scheme. Postponing a decision will likely work a substantial hardship on all those subject to the Manville reorganization, thus rendering the controversy ripe for adjudication. *See Pacific Gas & Electric*, 461 U.S. at 201, 103 S.Ct. at 1720–21; *Lake Carriers' Association*, 406 U.S. at 508, 92 S.Ct. at 1756; *cf. Jensen*, 127 B.R. at 33.

### Conclusion

For the reasons set forth above, Manville's Complaint meets both prongs of the *Abbott Laboratories* test and is ripe for adjudication. The Government's motion to dismiss the complaint for want of jurisdiction is therefore denied.

It is so ordered.